ROBERT K. AND JOAN L. PASCHALL, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 10478–08, 25825–08.[1]     Filed July 5, 2011.

R determined sec. 4973, I.R.C., excise tax deficiencies and additions to tax under sec. 6651(a)(1), I.R.C., for Ps' 2002 through 2006 tax years. The determinations stem from R's assertion that P–H made excess contributions to his Roth individual retirement account. *Held*: Ps are liable for the excise tax deficiencies and additions to tax to the extent decided herein.

*Howard S. Fisher*, for petitioners.
*Ronald S. Collins, Jr.*, *John A. Guarnieri*, and *Cindy Park*, for respondent.

WHERRY, *Judge*: These consolidated cases are before the Court on petitions for redetermination of respondent's determinations, in notices of deficiency, that petitioners owe excise tax deficiencies and section 6651(a)(1) additions to tax for their 2002 through 2006 tax years as well as an income tax deficiency and a section 6662(a) accuracy-related penalty for their 2005 tax year.[2]

The issues for decision are: (1) Whether petitioner husband made an excess contribution to his Roth individual retirement account (Roth IRA) and is liable for section 4973 excise tax deficiencies for the 2002 through 2006 tax years; (2) whether petitioner husband is liable for additions to tax under section 6651(a)(1) for failure to file Forms 5329, Additional Taxes on Qualified Plans (Including IRAs) and Other Tax-Favored Accounts, for the 2002 through 2006 tax years; and (3) whether the statute of limitations bars respondent

---

[1] The case at docket No. 10478–08 involves petitioners' 2004 and 2005 tax years. The case at docket No. 25825–08 involves petitioners' 2002, 2003, and 2006 tax years. The cases were consolidated for trial, briefing, and opinion on Feb. 12, 2010.

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 (Code), as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

8

from assessing and collecting deficiencies for the 2002, 2003, and 2004 tax years. [3]

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulations, with the accompanying exhibits, are incorporated herein by this reference. At the time they filed their petitions, petitioners resided in California.

Petitioners filed timely joint Forms 1040, U.S. Individual Income Tax Return, for all relevant years. This case stems from petitioner husband Robert K. Paschall's attempt to "convert a traditional IRA to a Roth IRA" (Roth restructure). [4] The Roth restructure was designed and implemented by A. Blair Stover, Jr. (Mr. Stover), and his colleagues at the accounting firm of Grant Thornton, L.L.P. (Grant Thornton).

## I. *Petitioners' Background*

Mr. Paschall graduated from Massachusetts Institute of Technology with a bachelor of science degree in physics and from the University of Illinois with a master of science degree in physics. He also received a management certificate for technical personnel from the University of California Los Angeles.

Mr. Paschall spent his entire career until his 1996 retirement working at North American Aviation, which eventually became Rockwell International. Petitioner wife, Joan L. Paschall, has a degree in secretarial science and from 1985 through 2008 worked as a teacher's assistant.

## II. *Roth IRA Restructuring*

### A. *Introduction to Jim Patton*

As he was nearing retirement, Mr. Paschall attended seminars where Jim Patton, a financial adviser, was one of the

---

[3] Respondent's $61,164 reduction in petitioners' allowable itemized deductions is computational and need not be addressed in this Opinion.

[4] The basic tax characteristics of a traditional IRA are (1) deductible contributions, (2) the accrual of tax-free earnings (except with respect to sec. 511 unrelated business income), and (3) the inclusion of distributions in gross income. See secs. 219(a), 408(a), (d)(1), (e). The basic tax characteristics of a Roth IRA are (1) nondeductible contributions, (2) the accrual of tax-free earnings, and (3) the exclusion of qualified distributions from gross income. Sec. 408A(a), (c)(1), (d)(1), (2)(A); *Taproot Admin. Servs., Inc. v. Commissioner*, 133 T.C. 202, 206 (2009).

speakers. At one of the seminars, Mr. Paschall gave Mr. Patton his name and telephone number.

Mr. Patton would occasionally call Mr. Paschall. On one occasion he claimed that he had a client who was performing a transaction that was perfectly legal and would convert a traditional IRA to a Roth IRA and that met all the tax requirements. He also contended that it was in full compliance with the tax laws and was a good investment. He recommended that Mr. Paschall pursue this transaction. The client Mr. Patton spoke of, Fred Nardi, eventually sent Mr. Paschall the notes he had taken on his own Roth restructure.

Mr. Paschall assumed Mr. Patton "was a very knowledgeable financial adviser with considerable experience and knowledge of the taxes and the finances and the legality of anything that he would recommend". He further assumed Mr. Patton "would recommend legal things and investments that were to my advantage".

B. *Introduction to Mr. Stover*

Mr. Patton introduced Mr. Paschall to Mr. Stover. Mr. Paschall first met Mr. Stover in Mr. Patton's office in early 2000. At this time Mr. Stover was a partner at Grant Thornton.

At the meeting Mr. Stover gave a presentation and explained the Roth restructure to Mr. Paschall who "did not fully understand it". Although he acknowledged that he did not understand the Roth restructure, Mr. Paschall believed it was "completely compliant with the tax law at that time" and was not a tax shelter.[5] Mr. Paschall decided to engage in the Roth restructure, his stated purpose being to save money on taxes.

C. *Engagement Letter*

On March 17, 2000, Mr. Paschall executed an engagement letter with Grant Thornton for professional tax and financial consulting services, specifically the Roth restructure. The engagement letter contemplated a fee of $120,000 and contained a clause providing that Grant Thornton would rep-

---

[5] Mr. Paschall explained: "Grant Thornton was the fifth largest accounting company in the country, and I believed them to be completely legal and experts in this business of accounting and tax preparation, and I put complete faith in what they told me and did for me".

resent and defend Mr. Paschall or any related entity at no additional cost in case of audit by the Internal Revenue Service (IRS). The engagement letter also contained an indemnity clause providing that Grant Thornton would reimburse and indemnify the Paschalls and any related entity for any civil negligence or fraud penalty assessed against them by Federal or State authorities.

Mr. Paschall paid the $120,000 fee for the Roth restructure.[6] The engagement letter provided that the fee was to be split equally between Grant Thornton and Nevada Corporation Associations, Inc., a law firm. Mr. Paschall never asked for nor did he receive an opinion letter regarding the Roth restructure.

### D. *Kruse Mennillo, L.L.P., and Individuals Other Than Mr. Stover*

In addition to Mr. Stover, Mr. Paschall had contact with other Grant Thornton employees including Ruth Donovan, Allen Davison, and Angela Parker.

In September 2001 Mr. Stover left Grant Thornton for Kruse Mennillo, L.L.P. (Kruse Mennillo), another accounting firm. Neither party presented evidence explaining the reasoning behind Mr. Stover's abrupt move. When Mr. Stover moved to Kruse Mennillo, certain individuals he worked with at Grant Thornton went with him. At the time Mr. Stover moved to Kruse Mennillo, Mr. Paschall followed him and began using Kruse Mennillo instead of Grant Thornton.

To Mr. Paschall's knowledge Kruse Mennillo did not receive any of the $120,000 fee that was paid to Grant Thornton for the Roth restructure. Mr. Stover eventually stopped dealing with Mr. Paschall, and at that time Marc Sommers, a tax lawyer at Kruse Mennillo and a former IRS employee, took over Mr. Paschall's Federal tax work.[7]

---

[6] As explained further *infra* note 9, Mr. Paschall did not directly pay Grant Thornton $120,000 to implement the Roth restructure. Rather, the fee was paid indirectly from Mr. Paschall's IRA through a corporation.

[7] Petitioners request that we take judicial notice of a Feb. 21, 2008, Department of Justice Press Release and a Complaint for Permanent Injunction against Mr. Stover filed Feb. 21, 2008. This Court will grant petitioners' request and has taken judicial notice of the documents requested and *United States v. Stover*, 731 F. Supp. 2d 887, 914–915 (W.D. Mo. 2010), holding that Mr. Stover had reason to know that various structures he promoted lacked any legitimate business purpose and granting injunctive relief against him. The case focused on "three multiple business entity structures sold and arranged by" Mr. Stover. The third structure, referred to

Continued

### E. *Independent Advice and Knowledge*

Despite the remarkable promised tax benefits of converting taxable IRA distributions to nontaxable Roth IRA distributions, Mr. Paschall did not ask anyone else's opinion on the viability of the Roth restructure. Mr. Paschall did not do any research on contribution limits to IRAs, taxation of excess contributions to IRAs, or taxation of distributions from IRAs.

Mr. Paschall understood that contributions to traditional IRAs were made tax free and distributions from them were taxable. He also understood that Roth IRAs were different in that, while the contributions were not deductible, the distributions were not taxed.

### III. *The Roth Restructure*

Grant Thornton, specifically Mr. Stover, "orchestrated and oversaw" all of the steps in the Roth restructure. Papers were prepared and then sent to Mr. Paschall for his signature. Mr. Paschall explained that he did not doubt anything they did and believed that the Roth restructure was a firm-sanctioned Grant Thornton transaction as opposed to a Mr. Stover individually conceived transaction. The Roth restructure was implemented as follows:

• March 14, 2000—The Paschalls maintained an investment account with Calvert Group with account number ending in 8724 (Calvert account).

• March 2000—In March 2000 Mr. Paschall opened a Self Directed Roth IRA at George K. Baum Trust Co. with account number ending in 2306 (Baum Roth IRA). On March 14, 2010, the Baum Roth IRA was funded with a $2,000 contribution made from the Calvert account.

• March 20, 2000—Two corporations, Telesis Acquisition & Investment Co., Inc. (Telesis), and West Star Global Holdings, Inc. (West Star), were organized, in the State of Nevada, by Nevada Corporation Associations. Telesis and West Star had the same principal place of business, and Mr.

by the District Court as the Roth/S structure "[skirted] the contribution limits applicable to Roth IRAs." *Id.* at 900. Allen Davison has also been enjoined from organizing, establishing, promoting, and selling certain tax structures. *United States v. Davison*, 105 AFTR 2d 2010–2278, 2010–1 USTC par. 50,406 (W.D. Mo. 2010), affd. as modified and remanded 407 Fed. Appx. 997 (8th Cir. 2011).

Paschall served as president, secretary, and treasurer of both corporations during all relevant periods. [8]

• March 20, 2000—Mr. Paschall opened a Roth IRA with First Union Securities, Inc., with account number ending in 4078 (First Union Roth IRA).Telesis had any employees at any time.

• March 22, 2000—As of this date, the Paschalls maintained a traditional IRA account at Resources Trust with account number ending in 1977 (Resources Trust IRA). On March 22, 2000, Mr. Paschall opened a Self Directed Traditional IRA at First National Bank of Onaga with account number ending in 3200 (FNBO IRA). On March 30, 2000, Mr. Paschall funded the FNBO IRA via a rollover of $1,391,941.64 from the Resources Trust IRA.

• March 27, 2000—The Baum Roth IRA purchased all of the shares of stock of Telesis for $2,000. On April 26, 2000, the FNBO IRA purchased all of the shares of stock in West Star for $1,392,801.96. On or about April 26, 2000, West Star transferred $1,272,801.96 to Telesis. [9] On April 28, 2000, $1,272,801.96 was transferred from Telesis to the Baum Roth IRA. Also on April 28, 2000, $1,272,801.96 was transferred from the Baum Roth IRA to the First Union Roth IRA. The money was invested in various publicly traded securities and mutual funds.

• December 17, 2001—Telesis and West Star executed articles of merger with each share of West Star stock being converted into 1 share of Telesis stock and with Telesis being the surviving corporation. The articles of merger were filed with the Nevada secretary of state on December 31, 2001. West Star was dissolved as of December 31, 2001. Telesis was dissolved on March 28, 2006.

• October 25, 2005—The Paschalls received a $41,900 distribution from their First Union Roth IRA. On December 7, 2006, the Paschalls received a $100,000 distribution from

---

[8] For 2000 and 2001, West Star filed Forms 1120, U.S. Corporation Income Tax Return, reporting zero gross receipts and zero deductions for each year. West Star reported assets of $2,000 cash as of Dec. 31, 2000, and assets of $1,000 stock as of Dec. 31, 2001. For 2000 through 2004, Telesis filed Forms 1120 reporting zero receipts and zero deductions for each year. Telesis reported assets of $2,000 cash as of Dec. 31, 2000; $1,900 cash as of Dec. 31, 2001 and 2002; and zero assets as of Dec. 31, 2003 and 2004. Neither West Star or

[9] The $120,000 difference between what the FNBO IRA purchased the stock in West Star for and the amount West Star transferred to Telesis was used to pay Grant Thornton's fee.

their First Union Roth IRA, which by that time had been renamed H&R Block Financial Advisors Roth IRA.

## IV. *Reporting the Roth Restructure*

Mr. Paschall personally prepared and completed his and Mrs. Paschall's income tax returns from 1959 until 1993. Stuart Jaeger prepared the Paschalls' income tax returns from 1994 through 1999. Mr. Paschall did not ask Mr. Jaeger his opinion on the viability of the Roth restructure.

As part of the fee Mr. Paschall paid for the Roth restructure, Grant Thornton prepared the Paschalls' tax returns for 2000. Kruse Mennillo prepared the Paschalls' tax returns beginning in 2001 and therefore prepared all of the returns for the tax years that are in issue before this Court. Mr. Paschall paid Kruse Mennillo to prepare the tax returns starting in 2001.

In order to facilitate the preparation of the returns, Mr. Paschall would provide the information and copies of pertinent documents asked for each year by either Grant Thornton or Kruse Mennillo. Because "They were prepared by reputable accounting firms", Mr. Paschall asserts that he thought that his 2000 through 2006 tax returns "were completely accurate".

## V. *The Result of the Roth Restructure and the Audit*

In 2003 the Paschalls' returns were audited by the California Franchise Tax Board, with the California Franchise Tax Board concluding that the Paschalls did not owe any additional taxes. The Paschalls were defended in the audit by Michael Coopit of Kruse Mennillo, who told the Paschalls at that time that the Roth restructure "was completely legal and that there was no problem at all".

In either 2003 or 2004 Mr. Paschall received a letter stating that Grant Thornton was turning over the names of people who had engaged in Roth restructures to the IRS. Mr. Stover at this time advised Mr. Paschall that the Roth restructure was legal but that he "might want to disclose on [his] income tax returns the structure". Mr. Paschall thereafter attached to Telesis' and his personal tax returns Forms 8886, Reportable Transaction Disclosure Statement. [10] Some-

---

[10] The Form 8886 contained little information, stating in the expected tax benefits section:

time in 2004 Mr. Paschall received, via Mr. Coopit, a memo concluding that the Roth restructure "was legal and met with all tax laws".

The Paschalls timely filed Forms 1040 for all years in issue. They did not file Form 5329 for any of the years in issue. On February 1 and July 23, 2008, respondent issued notices of deficiency showing the following deficiencies, additions to tax, and penalties: [11]

| Tax year | Deficiency | Addition to tax sec. 6651(a)(1) | Penalty sec. 6662(a) |
|---|---|---|---|
| 2002 | $83,238.00 | $20,809.50 | - - - |
| 2003 | 83,028.15 | 20,757.00 | - - - |
| 2004 | 82,818.00 | 20,704.00 | - - - |
| 2005 | 94,151.00 | 20,637.00 | $2,320 |
| 2006 | 82,278.00 | 20,569.50 | - - - |

The Paschalls timely petitioned this Court. Trial was held on February 25, 2010, in Los Angeles, California. At that trial, the Paschalls' attorney asked Mr. Paschall what advice he had received from professional advisers. Respondent objected to this testimony as hearsay, and the Court sustained those objections. The Paschalls later requested that the record be reopened to permit Mr. Paschall's testimony regarding expert advice in the light of *United States v. Moran*, 493 F.3d 1002 (9th Cir. 2007). That request was granted and additional testimony was heard on June 3, 2010.

OPINION

I. *Whether Respondent's Proposed Assessments of Excise Tax for the 2002, 2003, and 2004 Tax Years Are Barred by the Statute of Limitations*

Mr. Paschall argues that the statute of limitations bars respondent from assessing deficiencies for his 2002, 2003, and 2004 tax years. The deficiencies as determined by respondent for these years are excise tax deficiencies under section 4973 and additions to tax under section 6651(a)(1) for

"THE POTENTIAL BENEFITS IF ANY COULD BE EITHER A TAX SAVINGS OR COST DEPENDING ON THE TAXPAYERS RATE. THE COMPANY HAS HAD NO ACTIVITY FOR THE PAST THREE TAX YEARS".

[11] The notice of deficiency for the 2004 and 2005 tax years was issued on Feb. 1, 2008. The notice of deficiency for the 2002, 2003, and 2006 tax years was issued on July 23, 2008. The $94,151 deficiency for the 2005 tax year comprised (1) an excise tax deficiency of $82,548 and (2) an income tax deficiency of $11,603.

failure to file Forms 5329, the tax form on which the section 4973 excise tax is computed and disclosed.

Section 6501(a) provides the general rule that the amount of any tax imposed by the Code shall be assessed within 3 years of the filing of the return. However, in case of a failure to file a return, the tax may be assessed "at any time". Sec. 6501(c)(3).

Mr. Paschall did not file Form 5329 for any year at issue; however, he timely filed Forms 1040 for all years. He asserts that Form 5329 is not a separate tax return from Form 1040, that the statute of limitations started running when he filed the Forms 1040, and that the period of limitations had expired before respondent issued the notices of deficiency for the 2002, 2003, and 2004 tax years. Respondent asserts that Form 5329 is a separate tax return from Form 1040 and that since Mr. Paschall never filed Forms 5329, the section 4973 excise tax may be assessed at any time.

The resolution of this issue is governed by the Supreme Court's decision in *Commissioner v. Lane-Wells Co.*, 321 U.S. 219, 223–224 (1944). *Springfield v. United States*, 88 F.3d 750, 752 (9th Cir. 1996).

[A] taxpayer does not start the statute of limitations running by filing one return when a different return is required if the return filed is insufficient to advise the Commissioner that any liability exists for the tax that should have been disclosed on the other return * * * the relevant inquiry is whether the return filed sets forth the facts establishing liability. * * * [*Id.*, citing *Commissioner v. Lane-Wells Co.*, *supra* at 223.]

"Of crucial importance is whether the return, as filed, included sufficient information to allow the IRS to compute the taxpayer's liability". *Atl. Land & Improvement Co. v. United States*, 790 F.2d 853, 858 (11th Cir. 1986).

Section 4973 imposes an excise tax on excess contributions to Roth IRAs which is to be reported and disclosed on Form 5329. Upon review of Mr. Paschall's Forms 1040, respondent was not reasonably able to discern that Mr. Paschall was potentially liable for a section 4973 excise tax. While a line on each Form 1040, i.e., line 54 for 2000, line 55 for 2001, line 58 for 2002, line 57 for 2003, line 59 for 2004, and line 60 for 2005 and 2006, states "Tax on qualified plans, including IRAs, and other tax-favored accounts. Attach 5329

if required", Mr. Paschall left these lines blank, giving respondent no indication of his excess contribution.

We hold that the filing of the Forms 1040 did not start the statute of limitations running for purposes of the section 4973 excise tax in the absence of accompanying Forms 5329. See, e.g., *Springfield v. United States*, *supra* at 752 (holding that because Form 1099 requests information about non-employee compensation and Form 941 requests information about employee compensation, filing Form 1099 does not start the statute of limitations running for purposes of Form 941); *Atl. Land & Improvement Co. v. United States*, *supra* at 858 (holding that a payroll tax return (FICA) filed by an employer did not start the statute of limitations running for the employer's railroad tax liability (RRTA) because the FICA return did not contain all the information necessary to compute the RRTA). Because Mr. Paschall failed to file Forms 5329 for the years in issue, respondent may assess the excise tax deficiencies at any time.

II. *Section 4973 Excise Tax Deficiencies for the 2002 Through 2006 Tax Years*

A. *Burden of Proof*

As a general rule, the Commissioner's determination of a taxpayer's liability in the notice of deficiency is presumed correct, and the taxpayer bears the burden of proving that the determination is improper. See Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). However, pursuant to section 7491(a), in certain circumstances the burden of proof on factual issues that affect the taxpayer's tax liability "for any tax imposed by subtitle A or B" may shift to the Commissioner.

Mr. Paschall claims that pursuant to section 7491(a) respondent bears the burden of proof. However, section 7491(a) applies only to subtitles A and B, which include income taxes and estate and gift taxes. The excise tax deficiencies determined by respondent were computed under subtitle D. Section 7491(a) is therefore inapplicable, and Mr. Paschall bears the burden of proof.

B. *Analysis*

The amount of contributions a taxpayer may make in any given year to a Roth IRA is limited. Sec. 408A(c)(2) and (3). Section 4973(f) defines an excess contribution to a Roth IRA as the excess of the amount contributed over the amount allowable as a contribution. There is imposed for each taxable year an excise tax of 6 percent for excess contributions, computed on the lesser of (1) the amount of the excess contribution, and (2) the fair market value of the account as of the end of the taxable year. [12] Sec. 4973(a). The excise tax is imposed each year until the excess contribution plus earnings is eliminated.

Mr. Paschall presented no evidence to establish that he did not make an excess contribution to his Roth IRA. However, he disputes respondent's calculation of the section 4973 excise tax, stating that the issue is "How the excise tax is calculated under Code Section 4973(f), with regards to excess funding".

Respondent asserts that the entire $1,272,801.96 contribution from Telesis to the Baum Roth IRA on April 28, 2000, was an excess contribution. [13] Respondent further asserts that the excise tax calculations for the 2002 through 2006 tax years should be based on the value of the Baum Roth IRA at the end of each respective tax year because those amounts are less than the initial excess contribution. The value of the Baum Roth IRA at the end of each tax year was as follows: [14]

---

[12] A taxpayer may convert an amount from an IRA to a Roth IRA if, before Jan. 1, 2010, (1) modified AGI is $100,000 or less; (2) the married taxpayer files jointly; and (3) the taxpayer reports the conversion amount in income. Sec. 408A(c)(3)(B); sec. 1.408A–4, Income Tax Regs. If these rules are not followed, the taxpayer has a failed conversion which triggers the sec. 4973 excise tax on the amount transferred from the IRA to the Roth IRA. Sec. 1.408A–4, Q&A–3(b), Income Tax Regs. On or after Jan. 1, 2010, conversions may occur without consideration of the $100,000 modified AGI limitations. Mr. Paschall never argued that he converted an amount from his IRA to his Roth IRA. Nor did he report the conversion amount in income.

[13] Respondent has chosen not to assert a 2000 income tax deficiency arising from the conversion, against Mr. Paschall, because the period of limitations for assessment for that year has expired.

The funds held in the Baum Roth IRA on Apr. 28, 2000, were transferred to the First Union Roth IRA. Because the parties on brief continue to refer to Mr. Paschall's Roth IRA as the Baum Roth IRA, we do so as well.

[14] On brief, respondent provided the Court with the fair market value of the Baum Roth IRA at the end of each tax year. Apparently, Mr. Paschall had provided respondent with the fair market values immediately before trial but did not introduce them into the record. Respondent has accepted the fair market values as accurate and correct.

| As of Dec. 31 | Fair market value |
|---|---|
| 2002 .......................................................... | $764,200 |
| 2003 .......................................................... | 919,173 |
| 2004 .......................................................... | 991,675 |
| 2005 .......................................................... | 1,245,804 |
| 2006 .......................................................... | 1,037,275 |

Mr. Paschall asserts that the excise tax should be based on the $2,000 he used to initially fund the Baum Roth IRA and which was contributed to Telesis when the Baum Roth IRA purchased all of the stock of Telesis.[15] In arguing this, he places significance on the merger of West Star and Telesis, which occurred on December 17, 2001, months after the April 28, 2000, transfers moving the $1,272,801.96 initially in Mr. Paschall's traditional IRA to the Baum Roth IRA occurred.

We find Mr. Paschall's assertion unavailing. It is well settled that the substance of a transaction controls tax liability. *Gregory v. Helvering*, 293 U.S. 465, 469–470 (1935); *Lazarus v. Commissioner*, 58 T.C. 854, 864 (1972), affd. 513 F.2d 824 (9th Cir. 1975). Where a series of transactions, taken as a whole, shows either that the transactions themselves are shams or that the transactions have no "purpose, substance, or utility apart from their anticipated tax consequences", the transactions are nullified and not recognized. *Goldstein v. Commissioner*, 364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965).

The substance of what happened in the instant case is that approximately $1.3 million began the year in Mr. Paschall's traditional IRA and was transferred to his Roth IRA by the end of the year with no taxes being paid. Mr. Paschall did not attempt to provide a nontax business, financial, or investment purpose for what he did, and this Court cannot ascertain one. Instead, Mr. Paschall, incited by and at the urging of Mr. Stover, used corporate formations, transfers, and mergers in an attempt to avoid taxes and disguise excess contributions to his Roth IRA.

Mr. Paschall states that "The excise tax should be based upon the contribution to the Roth-IRA". We agree. The April

---

[15] As stated *supra*, the allowable amount of contributions to Roth IRAs is limited under the Code. This limit was $2,000 for the 2000 tax year. Secs. 219(b), 408A(c)(2). Hence, as respondent has acknowledged, the $2,000 initially contributed to the Baum Roth IRA generated no tax consequences.

28, 2000, contribution to the Baum Roth IRA via a transfer from Mr. Paschall's traditional IRA to West Star to Telesis to the Baum Roth IRA was an excess contribution.

As respondent contends, Mr. Paschall "sought to have [his] cake and eat it too, contributing the funds tax-free into the traditional IRA and withdrawing them tax-free from the Roth IRA, paying no tax on the conversion stratagem." Accordingly, we sustain respondent's determination and hold that Mr. Paschall is liable for section 4973 excise tax deficiencies for his 2002 through 2006 tax years. These deficiencies are to be calculated upon the fair market value of the Baum Roth IRA at the end of each tax year.

III. *Section 6651(a)(1) Additions to Tax for Failure To File Forms 5329*

A. *Burden of Proof*

Respondent bears the burden of production with regard to the section 6651(a)(1) additions to tax. See sec. 7491(c); *Higbee v. Commissioner*, 116 T.C. 438, 446–447 (2001). To meet his burden, respondent must produce sufficient evidence that it is appropriate to impose the determined additions to tax. See *Higbee v. Commissioner*, *supra* at 446. However, respondent does not have to produce evidence of reasonable cause, substantial authority, or lack of willful neglect. See *id.*

B. *Analysis*

Section 6651(a)(1), in the case of a failure to file on time any return required under section 6011(a), imposes an addition to tax of 5 percent of the tax required to be shown on the return for each month or fraction thereof for which there is a failure to file, not to exceed 25 percent in the aggregate. Generally, "any person made liable for any tax * * * shall make a return or statement according to the forms and regulations prescribed by the Secretary." Sec. 6011(a). The addition to tax will not apply if it is shown that such failure is due to reasonable cause and not due to willful neglect.

Taxpayers who have made excess contributions to an IRA are required to file Form 5329 each year that they have excess contributions. *Hellweg v. Commissioner*, T.C. Memo. 2011–58; *Frick v. Commissioner*, T.C. Memo. 1989–86, affd.

without published opinion 916 F.2d 715 (7th Cir. 1990); sec. 54.4972–1(a), Excise Tax Regs. Form 5329 is a tax return within the meaning of section 6011, and failure to file Form 5329 can result in section 6651 additions to tax. *Frick v. Commissioner*, *supra*. Further, as discussed *supra* part I, Form 5329 is a separate tax return from Form 1040. See also *Martin Fireproofing Profit-Sharing Plan & Trust v. Commissioner*, 92 T.C. 1173, 1192 (1989) (concluding that the same requirements apply in deciding both whether a return is sufficient for statute of limitations purposes and whether a return is considered filed for section 6651(a)(1) purposes).

Mr. Paschall stipulated that he did not file Form 5329 for any of the years at issue. Respondent has therefore met his burden of production. We now turn to the question of whether Mr. Paschall has proven that his failure to file was due to reasonable cause and not due to willful neglect.

The failure to timely file a tax return is considered due to reasonable cause where a taxpayer is unable to file the return within the prescribed time despite exercising "'ordinary business care and prudence.'" *Jackson v. Commissioner*, 86 T.C. 492, 538 (1986) (quoting section 301.6651–1(c)(1), Proced. & Admin. Regs.), affd. 864 F.2d 1521 (10th Cir. 1989). "[W]illful neglect" is defined as "a conscious, intentional failure or reckless indifference". *United States v. Boyle*, 469 U.S. 241, 245 (1985). Mr. Paschall, citing *United States v. Boyle*, *supra* at 249–251, argues that his reliance on tax advisers "constitutes reasonable cause for avoiding a failure to file penalty under" section 6651.

Generally, circumstances considered to constitute reasonable cause arise as a result of factors beyond a taxpayer's control and include situations such as unavoidable postal delays, timely filing of a return with the wrong office, death or serious illness of the taxpayer or a member of his immediate family, the taxpayer's unavoidable absence from the United States, destruction by casualty of the taxpayer's records or place of business, and reliance on the erroneous advice of an IRS officer or employee. *McMahan v. Commissioner*, 114 F.3d 366, 369 (2d Cir. 1997), affg. T.C. Memo. 1995–547; see also *Gagliardi v. Commissioner*, T.C. Memo. 2008–10. Reliance on a mistaken legal opinion of a competent tax adviser that it was unnecessary to file a return also con-

stitutes reasonable cause. [16] *McMahan v. Commissioner*, *supra* at 369. However, while good-faith reliance on professional advice may provide a basis for a reasonable cause defense, it is not absolute. [17] *Freytag v. Commissioner*, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991); *LaPlante v. Commissioner*, T.C. Memo. 2009–226.

"The advice must be from competent and independent parties, not from promoters of the investment" or advisers who have a conflict of interest. *Swanson v. Commissioner*, T.C. Memo. 2009–31 (citing *LaVerne v. Commissioner*, 94 T.C. 637, 652–653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992)); see *Hansen v. Commissioner*, 471 F.3d 1021, 1031 (9th Cir. 2006), affg. T.C. Memo. 2004–269. "Courts have repeatedly held that it is unreasonable for a taxpayer to rely on a tax adviser actively involved in planning the transaction and tainted by an inherent conflict of interest". *Canal Corp. v. Commissioner*, 135 T.C. 199, 218 (2010); see also *Pasternak v. Commissioner*, 990 F.2d 893, 902–903 (6th Cir. 1993), affg. *Donahue v. Commissioner*, T.C. Memo. 1991–181; *LaVerne v. Commissioner*, *supra* at 652–653.

A promoter is "'an adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction.'" [18] *106 Ltd. v. Commissioner*, 136 T.C. 67, 79 (2011) (quoting *Tigers Eye Trading, LLC v. Commissioner*, T.C. Memo. 2009–121). "A promoter's self-

---

[16] While the Supreme Court has indicated that reliance on a tax adviser as to whether a taxpayer needs to file can constitute reasonable cause, reliance on a tax adviser to prepare the return does not constitute reasonable cause. *United States v. Boyle*, 469 U.S. 241, 251 (1985); *Jackson v. Commissioner*, 86 T.C. 492, 539 (1986), affd. 864 F.2d 1521 (10th Cir. 1989).

[17] We have held that for a taxpayer to rely reasonably upon advice, "the taxpayer must prove * * * that the taxpayer meets each requirement of the following three-prong test: (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." *Neonatology Associates, P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002); see also *Charlotte's Office Boutique, Inc. v. Commissioner*, 425 F.3d 1203, 1212 & n.8 (9th Cir. 2005) (quoting with approval the above three-prong test), affg. 121 T.C. 89 (2003).

[18] We have held that a tax adviser was not a promoter of a transaction when he had a long-term and continual relationship with his client, did not give unsolicited advice regarding the tax shelter, advised only within his field of expertise (and not because of his regular involvement in the transaction being scrutinized), followed a regular course of conduct in rendering his advice, and had no stake in the transaction besides what he bills at his regular hourly rate. *106 Ltd. v. Commissioner*, 136 T.C. 67, 80 (2011) (citing *Countryside Ltd. Pship. v. Commissioner*, 132 T.C. 347, 352–355 (2009)).

interest makes \* \* \* 'advice' inherently unreliable." *Tigers Eye Trading, LLC v. Commissioner*, *supra*.

At a minimum, Mr. Stover and his colleagues charged a $120,000 flat fee. Mr. Stover set up the various entities and coordinated the deal "from start to finish." *106 Ltd. v. Commissioner*, *supra* at 80. Grant Thornton and Mr. Stover were paid a flat fee for "implementing \* \* \* [the Roth restructure] and wouldn't have been compensated at all if \* \* \* [Mr. Paschall] decided not to go through with it". See *id.* Mr. Paschall blindly followed Mr. Stover to Kruse Mennillo without questioning the reasons for his departure from Grant Thornton. Hence, Mr. Paschall cannot argue this alleged reliance on Mr. Stover and/or Grant Thornton establishes reasonable cause and good faith. See *Hansen v. Commissioner*, *supra* at 1027–1031 (affirming the Tax Court holding when the taxpayers relied solely on the organization promoting the transaction and did not independently verify their tax returns despite warnings by the IRS) (citing *Neely v. United States*, 775 F.2d 1092, 1095 (9th Cir. 1985)); see also *LaVerne v. Commissioner*, *supra* at 652.

To support his argument, Mr. Paschall cites *Haywood Lumber & Mining Co. v. Commissioner*, 178 F.2d 769, 771 (2d Cir. 1950), modifying 12 T.C. 735 (1949), *Orient Inv. & Fin. Co. v. Commissioner*, 166 F.2d 601 (D.C. Cir. 1948), and *Hatfried, Inc. v. Commissioner*, 162 F.2d 628 (3d Cir. 1947). Unlike the case at hand, in those Mr. Paschall relies on there is no evidence that the tax advisers were not independent. See *Haywood Lumber & Mining Co. v. Commissioner*, *supra* at 770–771; *Orient Inv. & Fin. Co. v. Commissioner*, *supra* at 602–603; *Hatfried, Inc. v. Commissioner*, *supra* at 631–632.

While Mr. Paschall argues that he also relied on Mr. Patton, there is no evidence, other than Mr. Paschall's testimony, what the two talked about.[19] Mr. Patton is not competent in tax matters; he introduced Mr. Paschall to Mr. Stover; and Mr. Paschall did not seek Mr. Patton out for an independent review of the Roth restructure; rather, Mr. Paschall contacted Mr. Stover.

---

[19] Mr. Paschall also appears to rely on individuals who signed his individual and corporate tax returns, including Angela Parker, Kelly Webb, and Jennifer Swearinger. However, there is no evidence that he ever spoke to any of these individuals about the Roth restructure. In any event, they also have conflicts of interest because they worked with Mr. Stover on the Roth restructure and were employees of Grant Thornton and/or Kruse Mennillo.

Only Mr. Paschall testified. Mr. Paschall appears to believe that his own self-serving testimony is enough to establish reasonable cause. We disagree. We have "found reliance to be unreasonable where a taxpayer claimed to have relied upon an independent adviser because the adviser either did not testify or testified too vaguely to convince us that the taxpayer was reasonable in relying on the adviser's advice". *Swanson v. Commissioner*, *supra*; see also *Heller v. Commissioner*, T.C. Memo. 2008–232 (in upholding a penalty stating that aside from the taxpayer's "self-serving testimony, there [was] no evidence in the record as to the specific nature of * * * [the professional's] advice"), affd. 403 Fed. Appx. 152 (9th Cir. 2010). Mr. Paschall's failure to introduce evidence "which, if true, would be favorable to [him], gives rise to the presumption that if produced it would be unfavorable." *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Mr. Paschall should have realized that the deal was too good to be true. See *LaVerne v. Commissioner*, *supra* at 652–653. Mr. Paschall is a highly educated and successful businessman. He explained to this Court that because he grew up in the Depression, he was conservative with his investments and worried "about having enough money" to last through retirement. Yet he paid $120,000 for a transaction that he "did not fully understand".

Mr. Paschall had doubts, repeatedly asking whether the Roth restructure was legal. Despite these doubts, he never asked for an opinion letter or sought the advice of an independent adviser, including Mr. Jaeger, who was preparing his tax returns at the time he met Mr. Stover. This was even after he received a letter warning him that there might be problems with the Roth restructure and that his name was being turned over to the IRS.

Mr. Paschall has failed to establish that he meets the reasonable cause and not willful neglect exception to the section 6651(a)(1) addition to tax.[20] Therefore, we sustain respondent's imposition of the section 6651(a)(1) additions to tax for the Paschalls' 2002 through 2006 tax years.

---

[20] Mr. Paschall also stated that he relied on the audit by the California Franchise Board and resulting "no-change" letter issued by that entity. Because of Mr. Paschall's lack of evidence, we attribute little significance to his alleged reliance on the California Franchise Board.

IV. *Income Tax Deficiency and Section 6662(a) Accuracy-Related Penalty for Petitioners' 2005 Tax Year*

In 2005 petitioners received a $41,900 distribution from Mr. Paschall's Roth IRA which they did not report on their 2005 Form 1040. To guard against a whipsaw, respondent determined an income tax deficiency and a section 6662(a) accuracy-related penalty for petitioners' 2005 tax year that were based on petitioners' possible argument that the Baum Roth IRA should be deemed a traditional IRA. Respondent has stipulated that he would concede the income tax deficiency and the related section 6662(a) accuracy-related penalty for petitioners' 2005 tax year if this Court held that Mr. Paschall was liable for section 4973 excise tax deficiencies. As we have found Mr. Paschall liable for excise tax deficiencies, the issue of whether petitioners are liable for an income tax deficiency and a section 6662(a) accuracy-related penalty for the 2005 tax year is conceded.

The Court has considered all of petitioners' contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*