T.C. Memo. 2016-31

UNITED STATES TAX COURT

BRIAN M. POLOWNIAK, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 20589-11, 20606-11.          Filed February 25, 2016.

Harry Charles, for petitioner.

Blaine C. Holiday and Wesley J. Wong, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, Judge: On June 9, 2011, respondent issued to petitioner a notice of

deficiency for 2004 determining a total deficiency in Federal income and excise

tax of $249,263.62, additions to tax under section 6651(a)(1)[1] and (2) of

_____

[1] All section references are to the Internal Revenue Code (Code) in effect for
the tax years at issue, and all Rule references are to the Tax Court Rules of

(continued...)

[*2] $20,228.76 and $22,476.41, respectively, and an enhanced accuracy-related penalty under section 6662A of $63,918.33.

Also on June 9, 2011, respondent issued to petitioner a notice of deficiency for 2005 determining a total deficiency in Federal income and excise tax of $150,869, additions to tax under section 6651(a)(1) and (2) of $29,395.26 and $32,661.41, respectively, and an enhanced accuracy-related penalty under section 6662A of $6,136.83. Petitioner seeks redetermination of the deficiencies, penalties, and additions to tax for 2004 and 2005.

In his answering brief respondent concedes that petitioner is entitled to a deduction for an additional $15,800 in travel expenses previously disallowed for 2004. Respondent also concedes that petitioner is not liable for an enhanced accuracy-related penalty under section 6662A for 2005. The remaining issues for decision are:

(1) whether petitioner is liable for excise tax on excess contributions to a Roth IRA under section 4973 for 2004 and 2005;

(2) whether petitioner's wholly owned subchapter S corporation, Solution Strategies, Inc. (Strategies), had additional gross receipts of $680,000 for 2004;

[1](...continued)
Practice and Procedure, unless otherwise indicated.

**[*3]** (3) whether Strategies is entitled to business expense deductions for meals and entertainment expenses of $2,199 and $4,739 for 2004 and 2005, respectively, and travel expenses of $53,707 for 2005;

(4) whether petitioner is liable for additions to tax under section 6651(a)(1) for failure to file Forms 5329, Additional Taxes on Qualified Plans (Including IRAs) and Other Tax-Favored Accounts, for 2004 and 2005;

(5) whether petitioner is liable for additions to tax under section 6651(a)(2) for failure to timely pay the above-stated liabilities for 2004 and 2005; and

(6) whether petitioner is liable for an enhanced accuracy-related penalty under section 6662A for an understatement attributable to a listed transaction for 2004.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, the second supplemental stipulation of facts, and the exhibits received in evidence are incorporated herein by this reference. Petitioner resided in Michigan when his petitions were filed.

I. Background

Petitioner has an advanced degree in business and over 35 years of sales and marketing experience with Fortune 500 companies. Petitioner has worked at

[*4] Proctor & Gamble and Johnson & Johnson and previously was the North American president of Kimberly Services. From 1981 to 2001 he was an independent contractor providing consulting services to Miller Heiman (MH), a company that trains sales professionals.

In 1997 while still contracting with MH, petitioner formed Strategies to consult in areas of business strategy development that included global growth focus, sales strategy, and global customer development. Strategies offered several of the services petitioner had previously provided to MH customers. Strategies was incorporated in the State of Missouri and elected to be a subchapter S corporation. Petitioner was the sole shareholder, officer, and director of Strategies. Throughout Strategies' existence petitioner was the only person who provided consulting services on the company's behalf.

In 2001 Delphi Automotive Systems (Delphi), a global automotive parts supplier, awarded a $680,000 contract to Strategies for petitioner's consulting services. Petitioner traveled extensively for Delphi, with multiple business trips to Europe, Asia, and South America in service of this contract.

II. Roth IRA Formation

In 2001 petitioner's financial adviser suggested that petitioner meet with an attorney who promoted the use of Roth IRAs and privately owned Roth IRA

[*5] corporations (PIRAC). In a PIRAC arrangement, an individual's new Roth IRA would purchase the stock of a new corporation. In most arrangements, the PIRAC would then engage in transactions with the individual's preexisting business, which was typically a pass-through entity such as Strategies, a wholly owned S corporation.

Petitioner decided to participate in one of these PIRAC arrangements, and as a result petitioner's then attorney incorporated Bevco Investments, Inc. (Bevco) on December 10, 2001. Bevco adopted a taxable year ending January 31[2] and named petitioner as its registered agent. From its incorporation to its dissolution in 2006 petitioner, in addition to being its registered agent, served as Bevco's sole officer, director, and employee.

On December 28, 2001, petitioner formed a new Roth IRA at First Regional Bank's Trust Administrative Services Corp. (TASC). Petitioner made an initial contribution of $2,000 to his Roth IRA. To facilitate the PIRAC arrangement petitioner directed his Roth IRA to purchase 98% of Bevco's stock in March 2002.

---

[2]Bevco as a C corporation chose a January 31 taxable yearend versus a calendar yearend. A fiscal yearend corporation reports on Form 1120, U.S. Corporation Income Tax Return, reflecting the first month of its taxable year. Bevco used the form corresponding with its taxable year beginning (i.e., tax year beginning February 1, 2002, and ending January 31, 2003, was reported on Form 1120 for calendar year 2002).

**[*6]** This stock was the entirety of the class A voting stock Bevco issued. The remaining 2% of stock was class B nonvoting stock and was subscribed to petitioner's administrative assistant, an independent contractor who had provided services to Strategies since its organization in 1997.

Around the same time, petitioner's then wife also formed a new Roth IRA at TASC. Her initial contribution was $655, and shortly after formation she directed her Roth IRA to invest the funds in Bevco. Following that investment, petitioner transferred 6% ownership of Bevco's class A stock from his Roth IRA to his then wife's Roth IRA and was given a retroactive effective date for the purchase. Petitioner's administrative assistant's 2% ownership interest did not change.

Following the setup and purchase of Bevco by the Roth IRAs, petitioner's wholly owned S corporation, Strategies, and Bevco entered into a subcontracting agreement for petitioner's consulting services. This agreement was given a retroactive effective date of January 2, 2002, with an original term of 12 months. The agreement provided that Strategies would pay Bevco 75% of the revenue it received from its anticipated 2002 consulting contract with Delphi. In exchange for this payment Bevco was expected to provide certain specified services for Strategies which would be provided personally by petitioner. These services were enumerated as follows: (1) propose worldwide structure changes for six divisions

[*7] of Delphi; (2) create business planning models to include forecasting and pricing models: (3) hire and appoint sales leadership positions; and (4) build business strategies for Delphi to implement with worldwide customers. This was the only contract ever executed between Bevco and Strategies. Delphi was never informed of this subcontracting agreement. Before Strategies made payments under the contract, petitioner's accountant suggested that research be reviewed to verify the propriety of disclosing excess contributions made to petitioner's Roth IRA to "capitalize" Bevco, but no Form 5329 was filed.

On May 16, 2002, Strategies made its first payment to Bevco of $400,000. Later in 2002 an additional $100,000 was transferred from Strategies to Bevco which was recorded on Bevco's books as a loan from Strategies. Throughout its existence Bevco's only source of revenue was deposits made to it by Strategies and returns on the investments made within Bevco's accounts.[3] Bevco never had an address, email account, or phone number assigned to it, and petitioner's administrative assistant, who was given 2% of Bevco's stock, never worked on behalf of Bevco.

---

[3]Additional deposits to and withdrawals from Bevco's checking account were identified in financial statements as petitioner's inheritance, U.S. Dept. of Ag. payments, Bevco's investment account deposits, and miscellaneous loans to and from petitioner.

**[*8]**   At the end of 2002 Delphi awarded another contract to Strategies and petitioner.  In December 2002 petitioner's consultants suggested electing the accrual method of accounting for Bevco and eliminating the Strategies subcontract with Bevco for 2003.  The parties thought that an election under Rev. Proc. 71-21, 1971-2 C.B. 549, would allow Bevco to defer its revenue until it was earned.  Because Bevco's fiscal yearend was January 31, any payments received before January 31, 2003, would not be reported until the 2003 fiscal yearend of January 31, 2004.  Attached to Bevco's 2002 Form 1120 was an election under Rev. Proc. 71-21, supra, to defer prepaid income until it was earned.  The election was signed by petitioner as president of Bevco and attached to a return received by the Internal Revenue Service (IRS) on April 15, 2003.  On January 13, 2003, Strategies transferred $680,000 (the entire Delphi contract payment) into Bevco's checking account.  The following year, on January 7, 2004, Strategies transferred an additional $680,000 (the entire Delphi contract payment) into Bevco's checking account.  Delphi expected petitioner to personally perform the consulting services, and Strategies did not inform Delphi that any of the services under the contracts would be performed by an independent contractor or by any other employee of Strategies.

[*9]  At some point in 2003 Bevco, at petitioner's direction, purchased petitioner's administrative assistant's 2% interest in the company (all class B nonvoting stock) for $20,000.  On July 19, 2004, petitioner filed a petition for divorce from his then wife.  As part of petitioner's divorce settlement, he was awarded all of his wife's Roth IRA's shares in Bevco under the separation agreement filed on December 2, 2005.  At the end of 2005 petitioner's Roth IRA owned 100% of Bevco.

TASC filed Forms 5498, IRA Contribution Information, for petitioner's Roth IRA for 2003, 2004, and 2005 showing the value of petitioner's Roth IRA equaling petitioner's initial contribution of $2,000.  Following petitioner's divorce, the Form 5498 for 2006 reflected a value of $2,665--the combined value of petitioner's $2,000 initial contribution and his wife's initial $665 contribution to her Roth IRA, which was subsequently invested in Bevco.  Bevco's purchase of all of the class B nonvoting stock for $20,000 was not reflected in the value of petitioner's Roth IRA.  The termination of Bevco on August 24, 2006,[4] had no effect on the relationship between petitioner and Delphi.  Petitioner continued to

_____

[4]Bevco Investments, Inc. Retirement Trust, wholly funded by Bevco, was also terminated, and it distributed its entire balance of $484,124 to petitioner, its sole participant.  The distribution was reported on a Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., for 2006.

**[*10]** perform all of the remaining services that Strategies was obligated to provide to Delphi.

III. Bevco's Tax Reporting

Bevco was incorporated on December 10, 2001. For its first full year of tax reporting on a 2002 Form 1120 for a year beginning February 1, 2002, and ending January 31, 2003, Bevco reported gross receipts of $782,390 and total assets of $43,785. On a 2003 Form 1120 for a year beginning February 1, 2003, and ending January 31, 2004, Bevco reported gross receipts of $719,537 and total assets of $610,934. On a 2004 Form 1120 for a year beginning February 1, 2004, and ending January 31, 2005, Bevco reported gross receipts of $680,000 and total assets of $242,919.[5]

Petitioner's Forms 1040, U.S. Individual Income Tax Return, filed during the same income tax years as Bevco's returns did not report any additional tax on IRAs or other qualified plans, nor did they include Forms 5329 disclosing excess contributions.

---

[5]Respondent issued a notice of deficiency to Bevco for 2004 for its tax year ending January 31, 2005. Bevco did not file a petition with this Court contesting the notice of deficiency, and the deficiency was subsequently assessed.

[*11] IV.  Strategies' Tax Reporting

During the years at issue Strategies filed a 2004 Form 1120S, U.S. Income Tax Return for an S Corporation, on which it did not report any income it received from the Delphi contract or any gross receipts.  It reported total deductions of $273,749, including travel expenses of $139,323, meals and entertainment expenses of $11,898, and a small amount of cancellation of indebtedness income, for a net loss of $271,853.  As sole shareholder, petitioner reported Strategies' net loss of $271,853 on a Schedule E, Supplemental Income and Loss, attached to his 2004 Form 1040.

For 2005 Strategies filed a Form 1120X, Amended U.S. Corporation Income Tax Return, reporting $616,190 in gross receipts and total deductions of $526,491, including travel expenses of $274,830 and meals and entertainment expenses of $24,250, for a net profit of $116,595.  Petitioner reported Strategies' income of $116,595 on a Schedule E attached to his 2005 Form 1040.

V.  Notices of Deficiency

On June 9, 2011, respondent issued a notice of deficiency to petitioner for 2004.[6]  Respondent determined that Strategies had failed to report income it

_____

[6]The notice of deficiency for 2004 was issued for the joint tax return of petitioner and his ex-wife.  His ex-wife requested relief from joint and several

(continued...)

**[\*12]** received from Delphi for its 2004 annual consulting contract of $680,000. Respondent also disallowed $2,199 of Strategies' reported deductions for meals and entertainment expenses. Respondent did, however, determine that petitioner was entitled to deduct an additional $73,453 in travel expenses. These adjustments led to an increase in petitioner's Schedule E income of $608,746 for 2004.

In addition to income tax determinations, respondent determined in the notice that petitioner was liable for excise tax under section 4973 for excess contributions to his Roth IRA. Section 4973 provides for a 6% excise tax on the total amount of excess contributions remaining in a Roth IRA on a yearly basis, so respondent included in the deficiency the cumulative excess contributions from petitioner's previous tax year 2003 as well as 2004. The notice of deficiency used the gross receipts reported on Bevco's Form 1120 to measure the excess contribution amount and then determined that petitioner was liable for $89,905 in excise tax under section 4973 on the following amounts: (1) Bevco's gross receipts of $782,390 for its taxable year ending January 31, 2003, reported on its 2002 Form 1120 and (2) Bevco's current fiscal year gross receipts of $719,537 for

---

⁶(...continued)
liability under sec. 6015(b), (c), and (f) before the notice of deficiency for 2004 was issued, but the IRS' determination was not reflected in the notice.

- 13 -

**[\*13]** its taxable year ending January 31, 2004, reported on its 2003 Form 1120 but (3) less the allowable Roth IRA contribution amount for 2004.

On June 9, 2011, respondent also issued a notice of deficiency to petitioner for 2005. Respondent disallowed deductions for Strategies' reported travel expenses of $53,707 and meals and entertainment expenses of $4,739. These adjustments led to an increase in petitioner's Schedule E income of $58,446 for 2005.

Respondent also determined that petitioner was liable for excise tax under section 4973. Because section 4973 provides for a 6% excise tax on the total amount of excess contributions remaining in a Roth IRA on a yearly basis, respondent included the cumulative excess contributions from petitioner's previous tax years 2003 and 2004 as well as 2005. The notice of deficiency again used the gross receipts reported on Bevco's Form 1120 to measure the excess contribution amount and then determined that petitioner was liable for $130,646 in excise tax under section 4973 on the following amounts: (1) Bevco's gross receipts of $782,390 for its taxable year ending January 31, 2003, reported on its 2002 Form 1120; (2) Bevco's gross receipts of $719,537 for its taxable year ending January 31, 2004, reported on its 2003 Form 1120; and (3) Bevco's gross receipts of $680,000 for its taxable year ending January 31, 2005, reported on its

**[*14]** 2004 Form 1120; but (4) less the allowable Roth IRA contribution amount for 2005.

In addition, respondent determined in both notices of deficiency that petitioner failed to file Form 5329 to report the excess contributions either to a Roth IRA or prior year excess contributions in his Roth IRA. Respondent determined that petitioner failed to file Form 5329 either as an attachment to his income tax return or separately and was, therefore, liable for additions to tax under section 6651(a)(1) for failure to timely file and section 6651(a)(2) for failure to timely pay. Respondent also determined petitioner failed to attach to his income tax return any Forms 8886, Reportable Transaction Disclosure Statement, and determined enhanced accuracy-related penalties under section 6662A for understatements attributable to listed transactions.

Petitioner timely filed the petitions in these consolidated cases.

OPINION

I. Burden of proof

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that the determinations are erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). In certain circumstances section 7491 may shift the burden of proof

[*15] on factual issues that affect the taxpayer's tax liability "for any tax imposed by subtitle A or B" to the Commissioner.  Sec. 7491(a).  However, section 7491(a) is inapplicable to excise tax liabilities, which are imposed under subtitle D of the Code.  See Paschall v. Commissioner, 137 T.C. 8, 17 (2011); Repetto v. Commissioner, T.C. Memo. 2012-168.

To shift the burden of proof with respect to income tax deficiencies, a taxpayer must introduce credible evidence regarding relevant factual issues and have:  (1) complied with all relevant substantiation requirements; (2) complied with all relevant record keeping requirements; and (3) cooperated with reasonable requests by the Commissioner for meetings, interviews, witnesses, documents, and information.  Sec. 7491(a)(1) and (2).  Credible evidence is evidence that, after critical analysis, the Court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted.  Higbee v. Commissioner, 116 T.C. 438, 442 (2001).

Petitioner has not alleged at any point that the burden of proof should shift to respondent in these cases.  Furthermore, petitioner has failed to show that he has substantiated each item at issue and produced all required records with respect to these issues.  Additionally, section 7491 is inapplicable to the excise tax liability respondent determined under section 4973.  Accordingly, petitioner bears

[*16] the burden of proof with respect to both the income and excise tax deficiencies at issue in these cases. See Paschall v. Commissioner, 137 T.C. at 17.

## II. Excess contributions to Roth IRAs

### A. Roth IRAs and Section 4973

Congress authorized the Roth IRA, a type of individual retirement account, with the enactment of section 408A in the Taxpayer Relief Act of 1997, Pub. L. No. 105-34, sec. 301, 111 Stat. at 824. The distinguishing feature of a Roth IRA is the timing of the tax benefit; the contributions to a Roth IRA are not tax deductible, but all earnings accumulate tax free and all qualified distributions from such an account are also tax free. See sec. 408A(a), (c)(1), (d)(1); Taproot Admin. Servs., Inc. v. Commissioner, 133 T.C. 202, 206 (2009), aff'd, 679 F.3d 1109 (9th Cir. 2012). Roth IRAs are designed to ensure that the taxpayer includes in income the amounts the taxpayer contributes to the retirement account.

Because of the significant tax benefits provided by Roth IRAs and the potential for abuse, Congress enacted certain restrictions with respect to their implementation. See sec. 408A. A taxpayer's total annual contribution to a Roth IRA is effectively limited by section 408A(c)(2) and (3). Section 408A(c)(2) sets a maximum contribution limit based on the maximum allowable deduction for traditional IRA contributions under section 219, and section 408A(c)(3) provides

**[\*17]** that the maximum annual contribution limit is phased out according to a taxpayer's modified adjusted gross income (AGI).[7]

Although the Code does not prohibit contributions above the amount allowed by section 408A (subject to its internal limitations), section 4973 imposes for each taxable year an excise tax of 6% for excess contributions computed on the lesser of (1) the amount of the excess contribution, and (2) the value of the account as of the end of the taxable year. See sec. 4973(a). The tax applies each year until the excess contributions are eliminated from the taxpayer's Roth IRA. See Paschall v. Commissioner, 137 T.C. at 18. Section 4973(f) defines an excess contribution to a Roth IRA as the excess of the amount contributed over the amount allowable as a contribution.

B. Notice 2004-8, 2004-1 C.B. 333

On December 31, 2003, the IRS issued Notice 2004-8, 2004-1 C.B. 333, titled Abusive Roth IRA Transactions. In that notice the IRS addressed taxpayers' attempts to avoid limitations on contributions to Roth IRAs. It states that the

---

[7]For 2003, 2004, and 2005 the contribution limits for a Roth IRA under sec. 408A(c)(2) were $3,000, $3,000, and $4,000, respectively. See also sec. 219(b)(5)(A). Taxpayers aged 50 or older before the close of the taxable year were entitled to an additional catch-up contribution of $500 in 2003, 2004, and 2005. See sec. 219(b)(5)(B). For 2004 and 2005 contributions by joint filers were phased out completely at a modified AGI of $160,000.

[*18] transactions generally involve (1) an individual who owns a preexisting business, (2) a Roth IRA maintained for that individual, and (3) a corporation of which substantially all the shares are owned or acquired by the Roth IRA (Roth IRA corporation). The notice describes typical fact patterns to include arrangements between the Roth IRA corporation and the individual or his preexisting business "that * * * [have] the effect of transferring value to the Roth IRA corporation comparable to a contribution to the Roth IRA." Id.

Notice 2004-8, supra, also states that the IRS will challenge the purported tax benefits resulting from such transactions. Id. It states that in addition to any other possible tax consequences, the amount treated as a contribution is subject to the excise tax under section 4973. Id. The notice identifies these transactions, as well as substantially similar transactions, as listed transactions for the purposes of section 1.6011-4(b)(2), Income Tax Regs. Id., 2004-1 C.B. at 334.

C. Substance Over Form

Generally, the substance and not the form of a transaction determines its tax consequences. Gregory v. Helvering, 293 U.S. 465, 469-470 (1935); Lazarus v. Commissioner, 58 T.C. 854, 864 (1972), aff'd, 513 F.2d 824 (9th Cir. 1975). Where a series of transactions, taken as a whole, shows either that the transactions are shams or that the transactions have no "purpose, substance, or utility apart

**[\*19]** from their anticipated tax consequences", the transactions are not recognized for Federal tax purposes.  Goldstein v. Commissioner, 364 F.2d 734, 740 (2d Cir. 1966), aff'g 44 T.C. 284 (1965); see also Commissioner v. Court Holding Co., 324 U.S. 331 (1945).

The parties agree that a Roth IRA may own an interest in an entity that may be recognized as a legitimate business entity for Federal tax purposes.  However, in these cases the preponderance of credible evidence compels a finding that the resulting transfers from Strategies of the Delphi payments to Bevco were nothing more than a mechanism for transferring value to the Roth IRA.  The subcontract agreement did not change the services provided to Delphi, and petitioner continued to do all of the work as he had done before the contract was put in place and after the payments were made to Bevco.  Accordingly, for the reasons laid out in greater detail below, the Court finds that the amounts transferred from Strategies to Bevco constituted excess contributions to petitioner's Roth IRA.

### 1.  Repetto v. Commissioner, T.C. Memo. 2012-168

In Repetto, the Court used the substance over form doctrine to reach a similar holding.  Repetto also dealt with an abusive Roth IRA transaction similar to that described in Notice 2004-8, supra.  In Repetto, the taxpayers also opened Roth IRAs with a $1,500 contribution to each Roth IRA and then directed those

[*20] Roth IRAs to purchase 98% of the shares of two newly organized corporations. The taxpayers' preexisting S corporation then contracted with one of the Roth IRA corporations to provide services in exchange for cash payments.[8] The taxpayers were the sole employees and directors of the new corporation owned by the Roth IRA and performed these purported services for the S corporation on the Roth IRA corporation's behalf.

The Court held that, in substance, the service agreement between the Roth IRA corporation and the preexisting S corporation was nothing more than a mechanism for transferring value to the Roth IRA. The Court found that the services performed by the Roth IRA corporation were services that had been previously performed by the preexisting S corporation, that there was an absence of normal business dealings between the preexisting S corporation and the Roth IRA corporation, and that payments made by the preexisting S corporation to the Roth IRA corporation lacked substance. Accordingly, the Court held that the payments from the preexisting S corporation to the Roth IRA corporation were essentially contributions to the taxpayers' Roth IRAs and that the taxpayers consequently were liable for excise tax under section 4973.

---

[8]The taxpayers also created an additional service contract to facilitate payments between the two new corporations owned by their respective Roth IRAs. That portion of the case is not relevant to the discussion of these cases.

**[*21]** Petitioner argues that <u>Repetto</u> is distinguishable because there the Roth IRA corporation created by the taxpayers issued dividends to their respective Roth IRAs. Petitioner asserts that because Bevco never issued any dividends to his Roth IRA, no excess contributions were made. Petitioner's argument, however, is misguided. While it is true that the Roth IRA corporation in <u>Repetto</u> issued dividends to the taxpayers' Roth IRAs, the case did not turn on this fact. In its holding, the Court did not limit the construed excess contributions to the amounts paid as dividends but rather found that all of the payments made by the preexisting S corporation to the Roth IRA corporation were excess contributions. To wit, the Court stated: "On these facts we find that the agreements and the payments made pursuant thereto were designed to permit and permitted the Repettos to make excess contributions to the Roth IRAs through the disguised service payments." <u>Repetto v. Commissioner</u>, slip op. at 30.

These cases are substantially similar to <u>Repetto</u>. All of the services petitioner performed purportedly on behalf of Bevco had been previously performed by petitioner on behalf of Strategies. During the years at issue petitioner performed all the sales and consulting work covered under Strategies' contract with Delphi. Since petitioner was the only person performing the services, the transfer of payments between Strategies and Bevco had no

[*22] substantive effect on the manner in which Strategies fulfilled its contract obligations with Delphi. Furthermore, Delphi was unaware of Bevco's existence as it continued to execute yearly contracts with Strategies and make all contractual payments to Strategies.

Additionally, as in Repetto, there was a complete lack of normal business dealings between Strategies and Bevco. The terms of the initial subcontracting agreement effective January 2, 2002, dictated that Strategies was to pay Bevco 75% of the revenue received from Delphi. Petitioner asserts that this division is based on the approximate time he spent performing nontraining consulting services on behalf of Bevco. The Court disagrees with this assertion for several reasons. First, this contract was not renewed beyond the initial term of 12 months. Additionally, even if the agreement survived as an oral renewal, it was not strictly adhered to when Strategies took the entire Delphi contract payment of $680,000 and transferred it to Bevco in both January 2003 and 2004. Further, Bevco never kept any accounting of the specific work it performed in relation to the Delphi contracts. Bevco never sent invoices to Strategies detailing what it did in exchange for the payments, nor did it keep any records as to what services it had performed and when. In addition, petitioner did not respect Bevco's business checking account when he continued to move funds between Strategies and his

[*23] personal accounts without the appearance of contemporaneous recordkeeping.

In addition to Bevco's lack of adequate records, there were inconsistencies with respect to administration. During the years at issue petitioner's administrative assistant was as an independent contractor for Strategies. Also, during the same time she performed all of the administrative services petitioner required for his services to the contracts executed with Delphi. This means that petitioner's assistant, while an independent contractor for Strategies, performed all of her general duties for petitioner without any regard to whether he was operating on behalf of Strategies or Bevco. Petitioner's administrative assistant was unaware that petitioner was operating as Bevco and thought that Bevco was a retirement plan for petitioner--which was what she was told when she was asked to become a 2% shareholder in Bevco. Moreover, Bevco never had a dedicated address, email account, or phone line, and the record does not suggest that Bevco ever attempted to market itself to any other clients beyond Strategies.

2. Asset Protection

Petitioner argues that the subcontracting agreement between Strategies and Bevco should be respected as substantive because it served the legitimate business purpose of protecting Strategies' assets from an anticipated lawsuit by MH. As

[*24] evidence of this legitimate purpose, petitioner relies on a threatening letter written by MH in 2007 and the unsupported assertion that Delphi wrote a check directly to Bevco, supposedly to shield the payment from MH.

However, petitioner terminated Bevco in August 2006 and continued to do business with Delphi as Strategies. Furthermore, petitioner's assertion that Delphi wrote a check directly to Bevco is incorrect. Petitioner claims that there is a copy of this check in the evidentiary record; however, the cited exhibit actually contains copies of Bevco's bank records that specifically indicate that the amount in question was transferred from Strategies to Bevco.

The Court finds that petitioner's argument--largely unsupported by any evidence beyond self-serving testimony--lacks credibility. Despite petitioner's claim that the agreements and transfers between Bevco and Strategies served the legitimate purpose of asset protection, petitioner continued to contract directly between Strategies and Delphi. Furthermore, the payments issued by Delphi all went directly to a Strategies bank account. It was only after these amounts were received and negotiated by Strategies that they were transferred to Bevco.

### 3. Hellweg v. Commissioner, T.C. Memo. 2011-58

Petitioner also argues that the instant case is more similar to Hellweg than it is to Repetto. In Hellweg the taxpayers owned an S corporation. The taxpayers

[*25] established Roth IRAs, and the Roth IRAs formed a Domestic International Sales Corporation (DISC) that entered into a commission agreement with the S corporation. Each Roth IRA subsequently contributed its ownership interest in the DISC to a C corporation in exchange for all of that corporation's unissued stock. Because of the DISC's tax treatment, the C corporations reported and paid applicable Federal income tax resulting from the commission fees generated by the DISC. Each C corporation then distributed some amount as a dividend to the Roth IRA shareholder. The Commissioner determined that the transaction resulted in excess contributions to a Roth IRA subject to section 4973 excise tax. However, the Commissioner made neither adjustments for Federal income tax purposes nor adjustments for reallocation of income.

The Court held that the transactions had to be treated consistently for section 4973 excise tax and income tax purposes. The Court stated that because the Commissioner made no section 482 adjustment that would result in distributions from the S corporation to the taxpayers for income tax purposes the commission payments could not be treated as excess contributions to the taxpayers' Roth IRAs.

Here the Court is presented with a different set of adjustments in the notices of deficiency. Although respondent did not specifically make a section 482

[*26] reallocation, the reallocation of income to Strategies served essentially the same purpose. The use of a section 482 adjustment was not necessary because the income was paid directly from Delphi to Strategies and incorrectly reported on Bevco's return and not reported by Strategies for 2004. This determination, among others, demonstrates that there were income tax adjustments for 2004 that were consistent with respondent's excise tax adjustments.

In Repetto the taxpayers made a similar argument that the Commissioner failed to treat that transaction with consistency for section 4973 excise tax and income tax purposes. The Court noted that although the Commissioner did not make a section 482 adjustment, he disallowed the business expense deductions the S corporation claimed for its payments to the Roth IRA corporation, holding that was sufficient to demonstrate consistency and distinguish the case from Hellweg.

Respondent made similar determinations with respect to Bevco and Strategies. Respondent essentially determined that amounts transferred from Strategies to Bevco were income for reporting purposes of Strategies for 2004. A taxpayer cannot avoid tax on income he earns by assigning it to another taxpayer. See Lucas v. Earl, 281 U.S. 111, 114-115 (1930). Therefore, the Delphi payment was income to Strategies resulting in a distribution from petitioner's wholly owned S corporation to petitioner, which he failed to report on his income tax

[*27] return for 2004.  As in <u>Repetto</u>, the Court finds that respondent has demonstrated adequate consistency such that these cases are distinguishable from <u>Hellweg</u>.  However, respondent did not make a similar determination for 2005.  The determination was limited to the adequate documentation of travel and meals and entertainment expenses of Strategies.  Strategies reported the Delphi income on its Form 1120X, and respondent did not determine additional income for Strategies for 2005.

### 4.  Calculation of the Excise Tax Under Section 4973

As stated above, section 4973 imposes for each taxable year an excise tax of 6% for excess contributions, computed on the lesser of (1) the amount of the excess contributions and (2) the value of the IRA account as of the end of the taxable year.  Calculating the excise tax under section 4973 therefore requires:  (1) calculating the excess contributions made; (2) calculating the Roth IRA's value at yearend; and (3) calculating the excise tax on the lesser of the two prior calculations.  Because of the definition of an excess contribution, the excise tax will continue to accrue on an excess contribution for each year that it remains within the Roth IRA.  Sec. 4973(f)(2).

As discussed above, the transfers between Strategies and Bevco were, in substance, merely a mechanism for transferring value into petitioner's Roth IRA.

[*28] As such, Strategies' transfers to Bevco should properly be considered contributions to petitioner's Roth IRA. Petitioner argues that he made no contributions to his Roth IRA beyond the initial contribution used to fund the Roth IRA because Bevco never issued any dividends and the value of the Roth IRA should be the same amount as TASC reported on Form 5498, that being $2,665. However petitioner's argument is unpersuasive. See Paschall v. Commissioner, 137 T.C. at 19. Much like what the Court found in Repetto, all of Strategies' payments to Bevco were excess contributions.

### a. Excess Contributions

Generally, section 4973(f) defines an excess contribution to a Roth IRA as the excess of the amount contributed over the amount allowable as a contribution. Respondent on brief reduced petitioner's excess contributions, and the Court will treat the difference as a concession by respondent.[9]

The record reflects that Strategies transferred payments from the Delphi contract to Bevco at the direction of petitioner for the benefit of his Roth IRA for 2003 and 2004. Therefore, after accepting respondent's concessions, the Court concludes that for purposes of section 4973(f) petitioner had excess contributions

_____

[9]Respondent allowed reductions from petitioner's excess contribution for the maximum allowable contribution to a Roth IRA for 2003, 2004, and 2005 under sec. 4973(f)(2)(B).

[*29] for 2004 and petitioner had prior year excess contributions reflected in the value of the Roth IRA in 2005.

### b. Valuation of the Roth IRA

Necessary to the calculation of excise tax under section 4973 is the yearend value of the Roth IRA. In the notices of deficiency, because Bevco's stock was the only asset in petitioner's Roth IRA, respondent determined the yearend values of the Roth IRA were equal to the gross receipts reported by Bevco on its corporate tax returns. Accordingly, respondent determined that the yearend value of petitioner's Roth IRA for 2004 was the sum of Bevco's gross receipts for its fiscal years ending January 31, 2003 and 2004. Respondent also determined that the yearend value of petitioner's Roth IRA for 2005 was the sum of Bevco's gross receipts for its fiscal years ending January 31, 2003, 2004, and 2005.

Respondent argues that his determinations are presumptively correct and that petitioner has failed to introduce any relevant evidence to satisfy his burden of proof with respect to the yearend values of his Roth IRA. Petitioner has argued that Bevco's stock has no value in that "Bevco was a one-man service corporation, set up to provide consulting services" or that the value was no more than what was reported by TASC on Form 5498, $2,665. Petitioner's assertions are similar to the failed arguments made by the taxpayer in Paschall, that the excise tax should be

[*30] based only on the $2,000 initial contribution to his Roth IRA to purchase the corporate stock.  Petitioner has failed to present any relevant evidence to satisfy his burden of proof that respondent's use of Bevco's reported gross receipts do not accurately reflect the value of his Roth IRA.

The Court agrees with respondent that petitioner has failed to satisfy his burden of proof with respect to the yearend value of petitioner's Roth IRA.  The Court finds that petitioner's excess contributions as calculated under section 4973(f) are less than the yearend values of his Roth IRA for 2004 and 2005, and the excess contributions or prior year excess contributions as the lesser of the two calculations should be used to calculate the excise tax.

III.  Strategies' Gross Receipts

Section 61(a)(1) defines gross income as all income from whatever source derived including compensation for services such as wages, salaries, and bonuses.  See also sec. 1.61-2(a)(1), Income Tax Regs.  It is also well established that income is taxed to the person who earns it, and a taxpayer cannot avoid income by assigning it to another taxpayer.  Commissioner v. Culbertson, 337 U.S. 733, 739-740 (1949); Lucas v. Earl, 281 U.S. at 114-115.

Strategies received $680,000 from Delphi for 2004.  The annual payment was received pursuant to a written consulting agreement between Strategies and

**[\*31]** Delphi, and Delphi issued the payment to Strategies under the terms of that contract. It is therefore clear that the $680,000 payment was gross income to Strategies for 2004.

Petitioner argues that Strategies did not err in failing to include the $680,000 from Delphi in gross receipts on its Form 1120S for 2004. Petitioner asserts that both he and Bevco paid tax on the proportional amounts received and that in the end no tax savings resulted from the omission.

Petitioner's position is predicated on the notion that any of the revenue Strategies received from Delphi that was later paid to Bevco should not be taxable income to Strategies. However, as discussed above, the Court finds that the substance of the subcontract agreement or any other transfers between Strategies and Bevco was that it was merely an instrument for transferring value to petitioner's Roth IRA in furtherance of a transaction that is substantially similar to the listed transaction in Notice 2004-8, supra. Strategies and Delphi had a contract that required the sole shareholder to provide substantial personal services and in return Delphi annually paid Strategies $680,000 on their contract to include payment in 2004. Accordingly, Strategies had additional unreported gross receipts of $680,000 in 2004.

**[\*32]** IV. <u>Strategies' Business Expense Deductions</u>

Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that he is entitled to any deduction claimed. Rule 142(a); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992); <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934). Section 6001 requires taxpayers to maintain records sufficient to establish the amount of each deduction. <u>See also</u> sec. 1.6001-1(a), Income Tax Regs.

Section 162(a) allows a deduction for ordinary and necessary expenses that a taxpayer pays in connection with the operation of a trade or business. <u>See, e.g.</u>, <u>Boyd v. Commissioner</u>, 122 T.C. 305, 313 (2004). To be "ordinary" the expense must be of a common or frequent occurrence in the type of business involved. <u>Deputy v. du Pont</u>, 308 U.S. 488, 495 (1940). To be "necessary" an expense must be "appropriate and helpful" to the taxpayer's business. <u>Welch v. Helvering</u>, 290 U.S. at 113. Additionally, the expenditure must be "directly connected with or pertaining to the taxpayer's trade or business". Sec. 1.162-1(a), Income Tax Regs.

Section 274 requires stricter substantiation for travel, meals, and certain listed property such as passenger automobiles. <u>See</u> <u>Sanford v. Commissioner</u>, 50 T.C. 823, 828 (1968), <u>aff'd per curiam</u>, 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). Section

[*33] 274(d) provides that no deduction shall be allowed unless the taxpayer substantiates, by adequate records or by sufficient evidence corroborating the taxpayer's own statements, the amount, time and place, and business purpose of the expense. See Oswandel v. Commissioner, T.C. Memo. 2007-183; sec. 1.274-5T(c)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985).

On its Form 1120S for 2004, Strategies claimed deductions for travel expenses of $139,323 and meals and entertainment expenses of $11,898. Following the audit related to these cases, respondent allowed a deduction for an additional $73,453 of travel expenses substantiated by Strategies' canceled checks, bringing the total to $222,474. This amount consisted of travel expenses of $212,776 and meals and entertainment expenses of $9,699.[10] As of his reply brief, respondent has also conceded an additional $15,800 of travel expenses for 2004, increasing the substantiated amount to $238,274.[11]

On its amended Form 1120S for 2005, Strategies claimed deductions for travel expenses of $274,830 and meals and entertainment expenses of $24,250.

---

[10]While the audit resulted in a substantial increase in the deduction for travel expenses allowed for 2004, it resulted in a net decrease of $2,199 for meals and entertainment expenses.

[11]Respondent discovered during this proceeding that a typographical error in the audit preparation reflected a check written on October 8, 2004, of $1,725 versus the correct amount of $17,525--a difference of $15,800.

[*34] During the audit Strategies was able to substantiate expenses of only $240,634 for 2005, consisting of $221,123 in travel expenses and $19,511 in meals and entertainment expenses. Accordingly, respondent disallowed deductions for travel expenses of $53,707 and meals and entertainment expenses of $4,739 for 2005.

Petitioner claims in his brief that he "previously provided proof of his [expense] charges via American Express to respondent" and that such proof in combination with the extensive travel itineraries he provided at trial is sufficient to substantiate all of his travel and meals and entertainment expenses. Petitioner makes no other argument with respect to these expenses, nor does he make any attempt to identify or account for these disallowed expenses that he has purportedly substantiated.

Petitioner is a sophisticated businessman and has indeed submitted extensive records of his travel in the form of travel calendars and trip-specific itineraries. These records detail the dates, locations of travel, and business purposes of his various trips. However, these travel records on their own do not substantiate the expenses as they do not show the amounts of the expenses nor that such expenses were actually paid. Respondent has allowed deductions for petitioner's travel and meals and entertainment expenses to the extent petitioner

**[\*35]** has substantiated the amounts through his American Express charges and the production of canceled checks written on Strategies' checking account.

For 2004 petitioner produced 10 checks written to American Express totaling $238,274. For 2005 petitioner produced an additional 10 checks totaling $240,634. Respondent has allowed exactly those amounts as deductions for 2004 and 2005. Petitioner has made no attempts to provide the Court with evidence of any other payments for travel and meals and entertainment expenses. With the heightened substantiation requirements under section 274 and the lack of additional documentation of the reported business expenses, petitioner has failed to show that he is entitled to any deductions beyond those already allowed by respondent.

V. Form 5329 and Section 6651(a)(1) Addition to Tax

Failure to file a tax return on the date prescribed leads to a mandatory addition to tax unless the taxpayer shows that such failure was due to reasonable cause and not due to willful neglect. Sec. 6651(a)(1). For each month the return is late, an addition to tax equal to 5% of the amount of tax required to be shown on the return shall be imposed, not exceeding 25% of the aggregate. Id. Under section 7491(c), the Commissioner has the burden of production to show that the imposition of an addition to tax under section 6651(a)(1) is appropriate. The

**[\*36]** burden of proving reasonable cause and lack of willful neglect falls on the taxpayer.  Rule 142(a); <u>United States v. Boyle</u>, 469 U.S. 241, 249 (1985).

Taxpayers are required to file a Form 5329 for each year they have excess contributions to an IRA.  <u>See</u> <u>Paschall v. Commissioner</u>, 137 T.C. at 20.  A Form 5329 is also required if a taxpayer has excess contributions from prior years.  A Form 5329 is a tax return within the meaning of section 6011, and the failure to file a Form 5329 when a taxpayer has an excess contribution or a prior year excess contribution can result in the imposition of an addition to tax under section 6651(a)(1).  <u>Id.</u>; <u>Repetto v. Commissioner</u>, T.C. Memo. 2012-168.  A Form 5329 may be filed as an attachment to an income tax return or as a separate return.  <u>See</u> sec. 301.6058-1(d)(2) and (3), Proced. & Admin. Regs.

The Court has found that petitioner made excess contributions to his Roth IRA for 2004 and had prior year excess contributions reflected in the value of the Roth IRA in 2005.  Petitioner has stipulated that he did not file a Form 5329 for either of the years at issue.  Petitioner has not alleged that such failure to file was due to any reasonable cause and not due to willful neglect.[12]  Accordingly,

---

[12]To wit, petitioner's only argument is that he did not make excess contributions to his Roth IRA for the years at issue and therefore is not liable for any additions to tax.

**[\*37]** petitioner is liable for the addition to tax under section 6651(a)(1) for 2004 and 2005.

## VI. Section 6651(a)(2) Addition to Tax

Section 6651(a)(2) imposes an addition to tax on taxpayers for their failure to timely pay the amount of tax shown on a return. A substitute for return prepared by the Commissioner under section 6020(b) is treated as a return filed by the taxpayer for purposes of section 6651(a)(2). Sec. 6651(g)(2); see also, e.g., Wheeler v. Commissioner, 127 T.C. 200, 208-209 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008).

Respondent has the burden to prove that substitutes for returns satisfying the requirements of section 6020(b) were submitted. See Cabirac v. Commissioner, 120 T.C. 163, 170 (2003); Gleason v. Commissioner, T.C. Memo. 2011-154. A return for section 6020(b) purposes must contain sufficient information from which to compute the taxpayer's tax liability. Spurlock v. Commissioner, T.C. Memo. 2003-124. Respondent has produced such information for Forms 5329 with respect to 2004 and 2005 and thus has met his burden.

Petitioner has failed to pay the amounts shown on the substitutes for returns respondent issued for Forms 5329. Petitioner once again does not argue that his

[*38] failure to timely pay was due to reasonable cause and not due to willful neglect. Accordingly, petitioner is liable for the addition to tax under section 6651(a)(2) for 2004 and 2005.

VII. Section 6662A Penalty

Section 6662A provides: "If a taxpayer has a reportable transaction understatement for any taxable year, there shall be added to the tax an amount equal to 20% of the amount of such understatement." The penalty applies to any item that is attributable to any listed transaction or any reportable transaction if a significant purpose of the transaction is the avoidance or evasion of Federal income tax. Sec. 6662A(b)(2). The penalty is increased from 20% to 30% of the amount of the understatement if the disclosure requirements of section 6664(d)(2)(A), requiring disclosure in accordance with the regulations under section 6011, are not met. Sec. 6662A(c). Section 6664(d) provides a defense to section 6662A if the taxpayer acted with reasonable cause and in good faith. However, this defense is unavailable in situations where the increased 30% penalty applies. See sec. 6664(d)(2).

A listed transaction as defined in section 6707A(c) is a transaction that is the same as or substantially similar to one of the types of transactions that the Commissioner has determined to be a tax avoidance transaction and has identified

**[*39]** in a written notice, regulation, or other published guidance as a listed transaction. <u>Blak Invs. v. Commissioner</u>, 133 T.C. 431, 445 (2009). Respondent contends that the transaction petitioner engaged in is the same as or similar to the listed transaction identified in Notice 2004-8, <u>supra</u>.

The regulations define the term "substantially similar" as "any transaction that is expected to obtain the same or similar types of tax consequences and that is either factually similar or based on the same or similar tax strategy." Sec. 1.6011-4(c)(4), Income Tax Regs. The goal in the transactions described in Notice 2004-8, <u>supra</u>, and the transaction petitioner executed is to avoid the limitations on contributions to a Roth IRA. Furthermore, the transaction described in the notice is factually similar to the transaction at issue, involving an individual with a preexisting business, a new Roth IRA for that individual, and a new Roth IRA corporation to which value from the preexisting business is transferred. Considering all the facts and circumstances, the transaction petitioner executed is substantially similar to that described in Notice 2004-8, <u>supra</u>. In addition, petitioner failed to comply with the disclosure requirements of section 6011 and its accompanying regulations. Therefore, petitioner is liable for the increased 30% penalty.

**[\*40]** Generally, section 6662A applies "to any item which is attributable to" any listed transaction. Sec. 6662A(b)(2)(A). For 2004 respondent's notice of deficiency determined that the Schedule E adjustments of $608,746 were attributable to the transaction in question. These amounts included unreported gross receipts from Strategies of $680,000 and the allowance and disallowance of certain deductions resulting in a net $608,746 increase in income. Respondent contends that the $680,000 of unreported gross receipts is clearly attributable to the listed transaction discussed above. The Court agrees. The effect of that transaction was to shift value away from Strategies, petitioner's wholly owned S corporation, and into Bevco, a company owned by petitioner's Roth IRA. The underreporting of income by Strategies is directly attributable to this scheme.

Respondent also asserts that the allowance and disallowance of certain deductions for 2004 are not attributable to the listed transaction and the proper amount subject to the penalty under section 6662A should be the full $680,000. However, since respondent did not seek an increased section 6662A penalty beyond the amount attributable to the $608,746 set forth in the notice of deficiency, he has conceded the difference. Respondent has also conceded the section 6662A penalty for 2005 because none of the amounts determined in the notice of deficiency are attributable to the listed transaction in question.

[*41] Accordingly, petitioner is liable for the 30% penalty under section 6662A for 2004 but only on the original amount reflected in the notice of deficiency.

The Court has considered all arguments the parties have made, and to the extent not discussed herein, we find that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.