T.C. Memo. 2017-142

UNITED STATES TAX COURT

BLOCK DEVELOPERS, LLC, WILLIAM J. MAXAM, APC, TAX MATTERS
PARTNER, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.   3198-10, 23598-12,          Filed July 18, 2017.
              23599-12, 23600-12.

Bruce Michael O'Brien and Laura L. Buckley, for petitioners.

Anna A. Long, Monica D. Polo, and Jeffrey L. Heinkel, for respondent.

---

[1] Consolidated with this case are: Niklas Jansson, docket number 23598-12;
Jan E. Jansson and Margareta Jansson, docket number 23599-12; and Fredrik
Jansson, docket number 23600-12.

[*2]        MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Southern Californians want to live on hills, but southern California hills want to slide toward the sea.  The primary taxpayer in these cases, Jan Jansson, is an expert in making these opposing forces work together.  He moved from Sweden to Los Angeles in the '80s and invented a type of interlocking concrete block that better enables builders to construct roads and homes on hillsides.  The blocks themselves then disappear from view--he designed them to allow vegetation to grow through and around them--while they perform their function of containing the lateral thrust of a hill on its base.

As he neared retirement Jansson opposed a more relentless force--the IRS.  He thought he had found a way to cut his income tax and preserve his wealth from estate tax by creating a partnership that would be owned by a series of Roth IRAs.  He argues that it's a solid wall between the Commissioner and his wealth; the Commissioner argues that it's only a paper barrier.

## FINDINGS OF FACT

Jansson and his wife of more than 50 years, Margareta, were born in Sweden.  Jansson went to carpentry school there and began his career in construction.  Though carpentry school provided him a fine education, Jansson

[*3] earned an engineering degree in 1964 from Stockholm Higher Technical College. He then moved out of wood and earned a postgraduate degree in concrete.  In 1969 he began to build a career by founding a construction company. Jansson's wife and their two then-young sons (Fred and Niklas) immigrated to the United States in 1983, and Jansson stayed behind to sell his company.  When he had, he rejoined his family in California.

A.    The American Dream

1.    Loffel Blocks

His American story begins with an earlier kind of concrete block--the Loffel Block.  Loffel Blocks[2] are a patented type of concrete block used to build retaining walls.  Soon after arriving in the United States, Jansson partnered with two other men--one of whom also had some experience in the concrete business--and together they signed an agreement to license the right to make and sell these blocks.  Jansson and his partners planned to sell retaining walls and use separate teams to produce and install the blocks.  But the plan failed before the licensing term even ended:  Errors in the manual provided by the Loffel licensor led to a

---

[2]  During trial the parties referred to these blocks as the "Löffelstein Blocks," but their stipulations and briefing refer only to Loffel Blocks.  In an effort to be consistent, we use only the term "Loffel Blocks" to refer to blocks produced by the Loffel Block Company.

**[*4]** lawsuit. Jansson settled the suit on favorable terms, under which he was able to make and sell blocks under the Loffel license free from any obligation to pay royalties.

2.     Soil Retention Systems

In June 1987 Jansson ventured out on his own and formed a corporation that he eventually named Soil Retention Systems, Inc.[3]  Jansson was, and continues to be, SR Systems' sole shareholder.  SR Systems at first just distributed Loffel Blocks throughout southern California but Jansson formed an LLC to build a new plant in Perris, California, to make the blocks.  SR Systems then made and sold these blocks for many years.

Jansson had bigger ambitions, though--he thought he could build a better block.  He wanted something more durable, more versatile, and more plantable.  His first innovation was a block that one could plant *in* the ground.  He won a patent on that design in the mid-'90s and for a time continued to work on his designs and market both his blocks and the Loffel Blocks.  But he kept

---

[3] In 1998 Jansson elected S corporation status for SR Systems.  An S corporation is a corporation governed under the laws of subchapter S of the Internal Revenue Code.  S corporations generally don't pay federal income tax but are, like partnerships, passthrough entities that channel income and deductions to their owners.  See Gitlitz v. Commissioner, 531 U.S. 206, 209 (2001).  Each shareholder must report his respective share of these items on his individual return.  Hill v. Commissioner, T.C. Memo. 2010-268.

[*5] tinkering, and finally developed the Verdura Block System at the turn of the century.

The Verdura Block System, like Loffel Blocks, is used to build retaining walls. It's meant to counteract the lateral force created by gravity and the mass of the soil. For lower walls, the simple weight of a single wall of blocks keeps things where they are supposed to be. What makes the Verdura Block System novel, though, is that the blocks interlock to form a grid. The system works in a single tier to a height of 49 feet, with multiple tiers backfilled with up to 30 cubic yards of dirt behind them. The blocks are also capable of supporting vegetation. The effect is pleasing to the eye and makes buildable lots on hills that otherwise would not support them. The system was a success and has been used in the construction of casinos, resorts, golf courses, parks, and even the San Diego Zoo.

Jansson heavily marketed the system. He went to local trade shows, distributed brochures, and placed ads in building magazines. He visited general contractors, engineers, and architects to show them his product. Home Depot eventually approached Jansson and advertised the Verdura Block System on televisions in the store.

This lifetime of work has led to great success in his field, and Jansson justly considers himself an expert in concrete and concrete products. He currently sells

[*6] his Verdura Block System at 30-40 outlets--it remains his biggest seller[4]--and he himself now belongs to no fewer than ten trade associations.

### 3.  Limiting Liability

But success had led Jansson to worry.  America is more lawsuit-happy than Sweden, and as Jansson's operations grew and diversified over the years he started to fear potential liability.  He split his activities into different companies:

- Toy Rentals: An S corporation that Jansson formed in 1993.  It owns the equipment used to install the blocks.  Though it has no employees, it rents its equipment to Jansson's other S corporations as needed.

- SR Products: An S corporation that Jansson formed in 1998.  SR Products has about thirty employees and immediately after its incorporation took over the manufacturing and distribution of the blocks from SR Systems.

- SR Designs: An S corporation that Jansson formed in 2004.  SR Designs lays out the grading plans for particular jobs with the help of a civil engineer and has only a few employees.

Jansson's entire family derives financial support through their roles in the SR businesses.  Jansson's son Niklas is--according to Jansson--the vice president of each business, but as a formal matter Niklas is the vice president of SR Systems only.  Julia Jansson (Niklas's wife) is something like an office manager for each

---

[4]  Jansson sells other concrete products as well.  He invented Drivable Grass --concrete capable of supporting growth of grass.  He also has a product called Enviroflex--a vertical interlocking concrete block designed for use where there are high-velocity waterflows.

**[\*7]** business--but also something more, as she tends to the wide range of chores that Jansson gives her.

Such informality is rampant within the companies. Though each business technically runs a separate portion of Jansson's overall enterprise, there is a great deal of everyday overlap. SR Systems employs about thirty people as foremen, laborers, and machine operators, but all share the same office space and phone number with SR Products and SR Designs. It's not just personnel--neither management nor resources are strictly split between them. And much of the documentation Jansson produced about these businesses bears the name only of "Soil Retention".

## B.    Jansson's Estate Planning

Jansson wanted his businesses to survive his retirement; and he credibly testified that although he was unfamiliar with estate planning, he did have a general goal in mind: He wanted to be able to get money out of the businesses, and had previously toyed with the idea of selling his patents but a deal never materialized. Looking for some guidance, he started going to seminars about retirement and pension planning. And at one of these he met Bill Maxam.

Maxam became the Janssons' estate planner. He himself has an entrepreneurial edge; while he practiced law for more than 40 years, he found the

[*8] time to build and manage four apartment buildings and three houses and even owns a chain of coin laundries. Somewhere between late 1997 and throughout 2001 Maxam met with Mr. and Mrs. Jansson four or five times, and came up with a complicated retirement plan that featured a role for himself as investor as well as adviser. It called for him to buy two of Jansson's most successful patents, each member of the Jansson family to open a Roth IRA, and Jansson to form a fifth business entity--a partnership with Maxam himself.

In January 2001 Jansson and Maxam signed a purchase option in which Jansson irrevocably granted Maxam the right to buy his Verdura Block patents for an amount "to be negotiated and paid" within the year. Jansson's stated reason for selling the patents was to replenish his cash after he'd spent a great deal on the factory in Perris. This prospective sale was coupled with another option, this one between SR Products and Maxam, under which Maxam agreed to pay SR Products 10% of its gross sales of blocks produced under the patents if the option were exercised. (It's not clear from the record how Maxam and SR Products decided on this rate.) That license option was for two years.

The next step was to create Roth IRAs, and this was done in April when Jansson, his wife, Fred, and Niklas opened self-directed Roth IRAs. Each Jansson

**[\*9]** made a $2,000 initial deposit. Each Jansson was the sole beneficiary of his or her Roth IRA, and each retained the authority to direct its investments.

Maxam then formed Block Developers, LLC, under Nevada law.[5] The parties stipulated that an amendment to Block Developers' articles of organization made Maxam its sole member and William J. Maxam, APC, its tax matters partner (and later a member). It was several months before Maxam opened a bank account for Block Developers. This was Block Developers' only account, and Maxam has held sole signature authority on it since it opened.

Next on the agenda was putting the Roth IRAs to work. Maxam drafted subscription agreements for each Jansson family Roth IRA and one for Maxam APC. Each Jansson signed his agreement on behalf of his Roth IRA and through this obtained an interest in Block Developers:

| Entity | Ownership (percentage) |
| --- | --- |
| Mr. Jansson Roth IRA | 23.75 |
| Mrs. Jansson Roth IRA | 23.75 |

---

[5] Though an LLC, Block Developers has elected to be taxed as a partnership, and we'll therefore refer to Block Developers' members as partners. See sec. 301.7701-3(a), Proced. & Admin. Regs. (Unless stated otherwise, all section references are to the Internal Revenue Code and regulations in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.)

| | |
|---|---|
| **[*10]** Fred Roth IRA | 23.75 |
| Niklas Roth IRA | 23.75 |
| Maxam APC | 5.00 |

Each Roth IRA bought its interest for $1,912, and Maxam APC paid $850. There were no additional contributions.

Maxam then drafted a patent-sales contract to exercise the option. Under this contract Jansson sold the Verdura Block patents to Block Developers for $250,000 payable in one upfront installment of $1,000 with $249,000 due the next month.[6] The next step was to deal with the license option. Maxam drafted a license and SR Products signed it in September. The license covered only the Verdura Block patents and obligated SR Products to pay a 10% royalty on gross receipts from the sale of Verdura Blocks.[7]

---

[6] If the U.S. Patent and Trademark Office decides that an inventor is entitled to a patent, it sends him a notice of allowance. See 35 U.S.C. sec. 151(a) (2012). Once the inventor returns it with the required fees and swears to the patent's specification, he is officially granted a patent under seal of the PTO and his patent is recorded in the PTO. See id. secs. 152-53. An "assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the * * * [PTO]." Id. sec. 261. Block Developers never recorded a security interest in the Verdura Block patents and never recorded the purported assignment with the PTO.

[7] Maxam testified during trial that he arrived at 10% after extensive negotiations. He consulted an accountant about on the value of the patents--

(continued...)

**[*11]**  In November Block Developers paid its first installment of $1,000 to Jansson with money it got from Maxam and for which it later reimbursed him. The money for the second installment traveled a more circuitous route:  By December 2001 SR Products had paid Block Developers about $270,000 in royalties.  Less than two weeks later, Block Developers paid its second installment of $249,000 to SR Products.  "Paid" might be too strong a word.  What happened was that SR Products just reduced its royalty payment to Block by the $249,000. (And it later offset the increase to taxable income from the patent sale with a large deduction for the payment of royalties.)  With the patents sold and the royalty agreement in place, the flow of money to the Janssons' Roth IRAs could begin: From 2001 through 2007 SR Products paid around $1.2 million[8] to Block Developers in royalties--$800,000 of which went into the Janssons' Roth IRAs.

---

[7](...continued)
bringing various documentation and dates on projected sales to their meetings.  He also discussed his potential investment with an architect.  He and Jansson met several times.  During these meetings Jansson allowed Maxam access to his books and records reflecting sales.  Using all this information, Maxam himself created various matrices to help him arrive at the 10% rate.  This all would have been very important if valuation proved to be an issue in these cases, though colored by the inclusion of the 10% royalty rate in the initial option agreement signed months before this work that allegedly led to the same rate months later.

[8]  This number is inconsistent with the amount SR Products deducted on its returns for those years.  From 2001 through 2007 SR Products deducted $2.4 million for royalties paid to Block Developers.

[*12] The record does not reflect where the rest of the money wound up, but Block has no employees and seemingly has few, if any expenses. During the 2006 tax year alone, it distributed $66,500 to each Jansson Roth IRA.

Jansson's stated reason for entering into the deal with Maxam was that he needed cash, but we have to find this to be a pretext. The money that he got from the sale of the patents came straight from SR Products. And we do not find credible some of the other reasons for these transactions. Jansson explained that Block Developers was supposed to provide asset protection. But if the corporate form was its means, it is hard for us to see how it even marginally improved on the protection that Jansson had already built up with the web of corporations in which he had already organized his businesses.

Jansson also testified that he'd hoped to increase profits on the patents by having Block Developers license the Verdura Block patents to other manufacturers. Block Developers, however, has never been an exhibitor at any trade show or produced any marketing material for Verdura Blocks. It was always Jansson and his sons, either individually or through SR Systems, that went to trade shows and advertised the Verdura Block System. It was always Jansson or SR Systems that distributed marketing materials--marketing material that never even

[*13] had Block Developers' name on it.[9] From 2001 to 2007 Block Developers did not even have employees who could have done these things. Block Developers never reimbursed Jansson or SR Products for any of their work advertising the Verdura Block patents. And Block Developers never owned or leased or controlled the land or equipment on which the Jansson companies produced the Verdura Blocks.

Block Developers' recordkeeping was also inconsistent and incomplete. Its billing statements to SR Products do not match actual payments. If SR Products did not have the funds to pay royalties, it simply didn't pay and there is no evidence in the record to suggest that Block Developers ever sought any recourse against SR Products when this happened.

That leaves us with the one remaining motive that the trial produced for this series of transactions among the Jansson family, the Jansson companies, and Maxam: estate and tax planning. But we must find it more likely than not that the estate planning involved centered on creating large and sporadic royalty

---

[9] Jansson did testify that he would direct potential licensees to Block Developers or Maxam, but the record has no evidence that this ever resulted in a second licensee. Maxam also testified that he had on a couple of occasions tried to court prospective licensees, but he did not provide their names or other identifying information to the Court, and we don't find this credible.

[*14] deductions from the moneys of profitable businesses to tax-free Roth IRAs using Block Developers as an otherwise nonfunctional conduit.

C.     The Returns

All the Janssons filed joint Forms 1040 for the 2005 and 2006 tax years. Neither Mr. and Mrs. Jansson nor Fred nor Niklas attached Form 5329, Additional Taxes on Qualified Plans (including IRAs) and other Tax-Favored Accounts, to the returns or has filed them since.  Block Developers itself did timely file Forms 1065, U.S. Return of Partnership Income, for its 2005 and 2006 tax years.

The IRS quickly figured out whose Roth IRA belonged to whom and that those IRAs all claimed to be partners in Block.  The parties stipulated that on or before June 15, 2008, the Commissioner's revenue agent knew each Jansson's name and address and that on or before September 30, 2008, knew that each Jansson was the sole beneficiary of his or her respective Roth IRA.  In December 2008 the Commissioner sent each of the Jansson Roth IRAs, in their capacities as partners of Block Developers, a notice of beginning of administrative proceeding-- a formal notice commonly abbreviated NBAP--that formally notified them he had begun an administrative proceeding--an audit, really--of Block Developers' 2005 tax return.  Less than a year later he sent NBAPs to the Roth IRAs for Block Developers' 2006 tax year.

[*15]   Then the Commissioner did something odd.  On December 22, 2009,[10] he sent an NBAP to each Jansson to tell each that he had begun an administrative proceeding about Block Developers for the 2005 and 2006 tax years.  He included with each of these NBAPs another IRS form, Letter 3857, Untimely Notice Letter, advising each of them that the NBAP he was sending was untimely.  The letters specifically advised the Janssons that the Commissioner was unable to mail the NBAPs to the Janssons within the time required under section 6223(d) for both the 2005 and 2006 tax years.  The letter advised them that this meant they could elect to have their items in the partnership treated as nonpartnership items, and each Jansson did send the IRS paperwork to opt out of the partnership proceeding for both years.  What made this even odder is that the Commissioner later rechecked his records and realized that he had sent NBAPs to the Roth IRAs back in December 2008.  These NBAPs were notices only about Block Developers' 2005 tax year, but it arguably meant that he should have sent the Untimely Notice Letter to the Janssons as individuals only for the 2006 tax year.

_____

[10]  The record also shows that an additional NBAP was issued to each of the Janssons in October 2009 for just the 2005 tax year.  But the parties stipulated the December 2009 NBAPs issued for the 2005 *and* 2006 tax years, so those are the ones we will work with.

[*16]  The Commissioner shortly thereafter closed his investigation and issued each of the Janssons a notice of deficiency for the 2006 tax year.  He also issued William J. Maxam, APC, as the tax matters partner[11] of Block Developers, a notice of final partnership administrative adjustment (FPAA).[12]

These notices of deficiency and the FPAAs set off a paper avalanche, and by the time it ended we had petitions from Mr. and Mrs. Jansson for their 2005-2007 tax years, from their son Fred for his 2005-2007 tax years, from their other son Niklas for his 2005 and 2006 tax years, from Niklas and his then-new wife for their 2007 tax year, and from Block Developers for its 2005 and 2006 tax years.

The cases then fell into motions practice.  The casualties that ensued were the Janssons' petitions that sought review of the notices of deficiency for their 2005-2007 tax years.  The Janssons all argued that we lacked jurisdiction in those cases because all the items listed in them were partnership adjustments that needed

---

[11]  Under the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648, a partnership must designate one of its partners as the tax matters partner (TMP) to handle its administrative issues with the Commissioner and manage any resulting litigation.  Sec. 6231(a)(7).

[12]  An FPAA generally includes: (1) a notice of final partnership administrative adjustment, (2) Form 870-PT, Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts, including a Schedule of Adjustments, and (3) an Exhibit A- Explanation of Items, that lists the Commissioner's other adjustments or determinations.

[*17] to be determined at the partnership level and this meant that only Block Developers' own case should go forward. The Commissioner moved to dismiss them on somewhat similar grounds, but added that the Janssons' election to opt out of the partnership proceeding for 2005 was ineffective because the IRS had in fact sent timely NBAPs to the IRAs and it was therefore the IRAs' responsibility to pass on those NBAPs to the Janssons as indirect partners of Block Developers itself.

We cut through this knot of abstruse procedure by simply dismissing the Janssons' individual petitions for lack of jurisdiction without having to analyze and find facts. See Jansson v. Commissioner, docket Nos. 3192-10, 3199-10 (Jan. 24, 2012) (order of dismissal) (citing GAF Corp. v. Commissioner, 114 T.C. 519 (2000)); Jansson v. Commissioner, docket No. 3206-10 (Jan. 26, 2012) (same). We explained that because the notices of deficiency in these cases were issued before the FPAAs and while the partnership-level proceeding was ongoing, a determination must first be made at the partnership level. We declined to find whether the Janssons could elect to treat their partnership items as nonpartnership items for the 2005 tax year--we held simply that we lacked jurisdiction to do so.

This meant that Block Developers' petition went forward as to the 2005 tax year, and is the only vehicle anyone can ride for that year. But the Commissioner

[*18] realized that his NBAPs to the Janssons really were untimely as to their 2006 year, which meant they really did have the right to opt out of the partnership proceeding for that year. Out went another round of notices of deficiency--these limited to their 2006 tax year--to Mr. and Mrs. Jansson and their two sons, and in came another round of petitions to challenge them.

Block then moved for partial summary judgment--asking us to find that its partners (the Roth IRAs) were not "pass-thru" partners after all. Based on clear precedent we explained that Roth IRAs are trusts, and that section 6231 makes trusts a type of "pass-thru partner." We denied Block's motion. See Block Developers, LLC v. Commissioner, docket No. 3198-10 (Oct. 16, 2014) (order denying partial summary judgment) (citing Murphy v. Commissioner, 129 T.C. 82 (2007)). That left Block Developers' petition in which it sought review of the FPAAs for the 2005-2006 tax years, and the Janssons' petitions in which they sought review of the notices of deficiency for their 2006 tax year.

**[*19]** The Commissioner made the following adjustments for Block Developers:[13]

|  | 2005 | 2006 |
|---|---|---|
| Other deductions | $55,424 | $19,332 |

The notices of deficiency for the individual Janssons were similar in their bottom lines:[14]

|  |  | Additions to tax | |
|---|---|---|---|
| Petitioner | Excise Tax | Sec. 6651(a)(1) | Sec. 6651(a)(2) |
| Mr. Jansson | $11,793 | $2,653.42 | $1,827.91 |
| Mrs. Jansson | 11,793 | 2,653.42 | 1,827.91 |
| Niklas | 11,793 | 2,653.43 | 1,827.92 |
| Fred | 11,793 | 2,653.43 | 1,827.92 |

We consolidated the cases and tried them in San Diego. Block's principal place of business was in California when it filed its petition. And all the Janssons were Californians when they filed their petitions.

---

[13] Block claimed on its returns that the deductions were for various management fees, office expenses, accounting fees, and amortization. Neither the Janssons nor Maxam addressed this issue during trial or on brief. We deem these conceded and need not discuss them further. See Rule 151(e); Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Tufft v. Commissioner, T.C. Memo. 2009-59.

[14] The Commissioner originally determined the Janssons had deficiencies in income tax as well as penalties under section 6662A. He has since conceded those issues because he took too long and the statute of limitations has run.

**[*20]**                                       OPINION

There remain only two issues for us to decide:

•        Was the Commissioner required to timely notify Block
         Developers' indirect partners (the Janssons) and not just their
         Roth IRAs?; and

•        Are the Janssons liable for excise taxes for excess Roth IRA
         contributions under section 4973 for the 2006 tax year?

We address each issue in turn.

I.       <u>The NBAPs</u>

The Janssons first try to knock down a chunk of the Commissioner's case

with a procedural challenge for the 2005 tax year. Section 6223(a) requires the

Commissioner to notify partners of the beginning of an administrative proceeding

at the partnership level. The Commissioner satisfies this obligation with an

NBAP. If he doesn't send an NBAP in a timely way, the partners affected by his

failure can often opt out of the TEFRA partnership proceeding and force the IRS

to proceed with notices of deficiency. But who is entitled to get an NBAP? The

Code and regs are a bit unclear. Section 6223(d) gives the Commissioner 120

days from the date notice was provided to the TMP to send an NBAP to "notice

partners," which means at least those partners listed on the partnership return.

**[*21]** Secs. 6223(d)(1), 6231(a)(8).  And the Commissioner did timely issue these NBAPs to the Roth IRAs as notice partners of Block Developers.

So far so good for the Commissioner.  But the Janssons argue that they have procedural rights as "indirect" partners.  Indirect partners are persons who have a profits interest in the partnership "by reason of ownership of an interest through 1 or more pass-thru partners."  Sec. 6223(c)(3)(A); see also sec. 6231(a)(10).  The Janssons argue that the Commissioner was required to issue NBAPs to each of them as indirect partners.

The regulations say:

> (a) In general.--In addition to the names, addresses, and profits interests as shown on the partnership return, the Internal Revenue Service *will use* additional information as provided in this section for purposes of administering subchapter C of chapter 63 of the Internal Revenue Code.

> (b) Procedure for furnishing additional information.--(1) In general.  Any person may furnish additional information at any time by filing a written statement with the Internal Revenue Service. * * *

> *        *        *        *        *        *        *

> (f) Internal Revenue Service *may* use other information.  In addition to the information on the partnership return and that supplied on statements filed under this section, the Internal Revenue Service *may* use other information in its possession * * * in administering subchapter C of chapter 63 of the Internal Revenue Code.  However, the Internal Revenue Service is not obligated to search its records for information not expressly furnished under this section.

**[*22]** Sec. 301.6223(c)-1, Proced. & Admin. Regs. (emphases added).

When the Commissioner doesn't send out an NBAP as these regulations require, an indirect partner has some remedies. See sec. 6223(e). The remedy here, say the Janssons, is that they should be allowed to opt out of the partnership proceeding for the 2005 tax year. The partnership case would continue as to the TMP and its 5% share, but the Commissioner would have to gear up a deficiency proceeding for each of the indirect partners.

But how do these regulations apply here? All parties agree that the revenue agent assigned to the case was aware that the Janssons were Block Developers' indirect partners. And all agree that the revenue agent didn't get that information from the face of the return or from a formal written statement filed with the IRS.[15] All agree instead that the agent found the information while searching the Janssons' tax information during the audit.

The regulation states that an agent is not required to search IRS records for this information. The issue is whether--once the agent voluntarily searched the records and found that the Janssons were indirect partners--he was required

_____

[15] The Commissioner argues that the agent never had information about the Janssons' profit shares in Block Developers, but the parties stipulated otherwise. We generally hold parties to their stipulations, and we will do so here. See Rule 91(e).

**[*23]** to issue an NBAP to each of them rather than just to their Roth IRAs. We can find the answer in the regulation itself. Here we find it in section 301.6223(c)-1(a), which says that the IRS "will use additional information as provided in this section." Paragraph (b) then gives the procedure for furnishing that "additional information." The Janssons concede that they didn't use that procedure to provide the IRS with the additional information that they were indirect partners, which means that the "will use" in paragraph (a) does not apply to their cases. This means that only paragraph (f) applies, and that *allows* but does not *require* the Commissioner to use the information he discovers on his own.

This is not the first time we've reached this conclusion. In Taurus FX Partners, LLC v. Commissioner, T.C. Memo. 2013-168, at *13-*14, we reasoned that "the regulation further provides that the IRS 'may use other information in its possession.' 'May' is permissive; it does not create an obligation." Courts elsewhere have reached similar decisions. For example, in Camacho v. United States, 195 B.R. 114, 116 (D. Alaska 1996), the court concluded that without specific notification to the government, section 6223 places the burden on the TMP to notify passthrough partners of audits. More recently in Kearney Partners Fund, LLC ex rel. Lincoln Partners Fund, LLC v. United States, 946 F. Supp. 2d 1302, 1311-12 (M.D. Fla. 2013), the court found that the use of the term "will",

**[\*24]** and not "should" or "may", in an IRS Announcement denoted "an intent to be bound."

We've also addressed the situation where the Commissioner chose to send an FPAA to indirect partners rather than a direct partner because he had sufficient information to identify them. Murphy v. Commissioner, 129 T.C. 82 (2007). The Commissioner argued there that because the information was readily available, he was "required" to use it. Id. at 86. We held for the Commissioner, but cautioned that the Commissioner was "permitted" and not necessarily "required" to notify the indirect partners. Id. at 87-88.[16]

II.     Excise Taxes

A.     The Statutory Framework

A Roth IRA is a retirement account that offers special tax advantages to taxpayers. Contributions to a Roth IRA are not deductible, earnings that accrue are tax-free, and qualified distributions down the line are not included in a taxpayer's gross income. Sec. 408A(c)(1), (d)(1); Taproot Admin. Servs., Inc. v.

---

[16] We were, however, a bit ambiguous. In the introduction to our analysis we described the Commissioner's argument that his agent was "required" to mail notice to the indirect partners, and then said "we agree." The Janssons argue this supports their position. We disagree, because we did not *hold* that the Commissioner was required under section 301.6223(c)-1(f) to mail notice to indirect partners once he has that information available. Murphy does not contradict Taurus FX.

[*25] Commissioner, 133 T.C. 202, 206 (2009), aff'd, 679 F.3d 1109 (9th Cir. 2012). Contributions, however are limited for each tax year according to a somewhat complicated formula. See sec. 408A(c)(2). During the years at issue Roth IRA contribution limits were generally $4,000 per year. See secs. 408A(c), 219(b)(5)(A). (Even today that limit is only around $5,500. See secs. 408A(c), 219(b)(5)(A)-(C) (2014).) Though the Code doesn't prohibit contributions above these amounts, section 4973(a) imposes a 6% tax on them. And the tax doesn't apply *only* for the year a taxpayer made an excess contribution--it applies each year until he removes the excess. Sec. 4973(b)(2).

B.   Notice 2004-8

In December 2003, the IRS issued Notice 2004-8, 2004-1 C.B. 333, to advise taxpayers that the IRS considered some transactions using Roth IRAs to be abusive tax-avoidance transactions, and it identified excess contributions as their key element. The Notice identified these transactions as those that involve:

- an individual who owns a business,

- a Roth IRA maintained for that individual, and

- a corporation the shares of which are substantially owned or acquired by the Roth IRA.

[*26] The transactions that the Notice describes typically feature the exchange of property from the existing business to the corporation owned by the Roth IRA for less than fair market value, but the stumbling block to its validity is that the transaction has "the effect of transferring value to the Roth IRA Corporation comparable to a contribution to the Roth IRA." Notice 2004-8, supra. The Notice specifically identifies ways the IRS would challenge these types of transactions-- one of which is to assert that the transactions lack substance.

One of the Janssons' major arguments is that Notice 2004-8 doesn't apply to them because the sale of the Verdura Block patents and the corresponding royalty rate were both at fair market value. The Janssons briefed the question at length and took great pains at trial to show that was the case, but proper valuations of the patents and royalty rates don't by themselves determine a transaction's lack of substance.[17]

Substance-over-form is a court-constructed rule--it says that in tax cases a court doesn't just follow the labels a taxpayer uses, but looks to see what in fact is going on. See Commissioner v. Court Holding Co., 324 U.S. 331, 333-34 (1945);

---

[17] Likewise, we do not need to find that Block Developers was a sham partnership to determine whether the Janssons are liable for excise taxes, and we will not address that argument. We also do not address the Commissioner's alternative argument that Jansson improperly assigned his income to Block Developers.

[*27] <u>Gregory v. Helvering</u>, 293 U.S. 465, 469-70 (1935); <u>Goldstein v. Commissioner</u>, 364 F.2d 734, 740 (2d Cir. 1966), <u>aff'g</u> 44 T.C. 284 (1965). We have applied substance-over-form again and again to deals that Notice 2004-8 describes. In <u>Repetto v. Commissioner</u>, T.C. Memo. 2012-168, 2012 WL 2160440, the taxpayer's Roth IRA formed a "service corporation" that received "service" payments but didn't actually perform any services for the taxpayers' business. We looked behind the label and found that the service payments were "nothing more than a mechanism for transferring value to the Roth IRAs." <u>Id.</u>, 2012 WL 2160440, at *10. We then recharacterized those payments as contributions. <u>Id.</u> at *11.

More recently, and on facts quite similar to those before us now, we decided <u>Polowniak v. Commissioner</u>, T.C. Memo. 2016-31, <u>appeal dismissed</u> (6th Cir. May 3, 2017). Like the Janssons, Polowniak already had an existing successful business. <u>Id.</u> at *4. He and his wife each opened a Roth IRA and directed each to invest in a second corporation (Bevco). Bevco subcontracted with Polowniak to provide consulting services, which Bevco then sold back to Polowniak's existing business for a percentage of its profits. <u>Id.</u> at *5-*6. Bevco would then "distribute" that money to the Roth IRAs. <u>Id.</u> at *13.

**[*28]**  We didn't question Bevco's legal status as a corporation.  We didn't question the price it charged for Palowniak's services.  And we didn't question the right of a Roth IRA to own an interest in a closely held corporation.  We nonetheless concluded that the taxpayer's transfers were nothing more than a mechanism for transferring value to his Roth IRA.  Id. at *18-*19.

Our decision turned on a few major points:

- The services that Polowniak performed for Bevco were the same he had always performed--the new corporation had no effect on how he conducted his business.  Id. at *21-*22.

- There was a lack of normal business dealings between the two corporations.  Neither adhered to contracts, and recordkeeping was sparse.  Id. at *22-*23.

- Bevco's administration was inconsistent--an employee for the old business performed tasks for Bevco without regard for the fact that it was a separate business, and Bevco did not even have a designated address or contact information.  Id. at *23.  Nor did Bevco market itself to clients beyond the existing business.  Id.

- Polowniak's claims to a legitimate business purpose were easily debunked by the record.  Id. at *23-*24.

The similarities between Polowniak and these cases are undeniable.  SR Products' sale of the Verdura Block patents to Block Developers had no substantive effect on how Jansson operated his businesses.  Jansson's companies continued to produce the blocks, test the blocks, and make sure the blocks were

**[\*29]** certified. The Jansson family continued to attend trade shows and take on clients without any mention of Block Developers. And the expense of performing these tasks remained on Jansson--he was never reimbursed by Block Developers.

As in Polowniak, there were major holes in the business dealings between the old company and the new. Block Developers did not keep consistent records, and billing statements to SR Products did not match up with payments. There is little evidence in the record detailing what services Block Developers actually performed for SR Products--not that it seems it could have without a single employee. Nor did the parties adhere to written agreements--if SR Products did not have the funds to make a royalty payment, it simply did not pay, and Block Developers did nothing about it. Block Developers' administration was no different: It did not employ anyone to perform even menial administrative tasks, and other than Maxam's testimony--which we don't believe on this point--there is no evidence to suggest that Block Developers itself ever tried to market the Verdura Block patents.

Jansson's claim that Block Developers had a legitimate business purpose falls apart rather quickly after even a cursory view of the record. He says that he sold the Verdura Block patents to generate cash. This is illogical--the money Block Developers paid to SR Products in exchange for the Verdura Block patents

[*30] *came from* SR Products, which means the sale did not actually raise new capital for SR Products. Jansson's claim that Block Developers would protect his assets is unfounded--Maxam did not take steps to protect Block Developers' interests in the patents, and there is no additional evidence or testimony to lead us to conclude that Block Developers' formation somehow protected the Janssons' assets. And, as we've already found, the record is void of any credible evidence that Block Developers tried to license the Verdura Block patents.

Even if the Janssons correctly valued the sale of the patents on paper, and even if they correctly set the royalty rates that they charged SR Products on paper, we cannot ignore the underlying reality of the transaction. We find that Block Developers was just a conduit to shunt money to the Janssons' Roth IRAs and was not engaged in any real business activity. We therefore find that Block Developers' transfers to the Janssons' Roth IRAs were excess contributions that triggered the excise tax the Commissioner seeks.

We do acknowledge that the substance-over-form doctrine is not something the Commissioner can use to pound every Roth IRA transaction he doesn't like. The Sixth Circuit recently reversed one of our decisions rooted in the doctrine. See Summa Holdings, Inc. v. Commissioner, 848 F.3d 779 (6th Cir. 2017), rev'g T.C. Memo 2015-119. In Summa, the taxpayers had a similar setup: a business

**[*31]** entity whose sole purpose was to transfer money into Roth IRA accounts.

But there the entity was a domestic international sales corporation. See secs. 991-

996. Because a DISC's congressionally sanctioned purpose *was* tax avoidance,

the Sixth Circuit held that neither the Commissioner nor the courts had any basis

to recharacterize the transactions at issue according to their substance. Summa,

848 F. 3d at 782, 786. But Summa's facts are not the Janssons'; LLCs, unlike

DISCs, are meant to have a real business purpose. The Sixth Circuit in Summa

specifically okayed the use of the substance-over-form doctrine in cases where

taxpayers used a corporate form that lacked any substance to facilitate a tax-

avoidance scheme. Id. at 785-86. It wrote that Repetto was such a case. Id. at

[*32] 786.  Today we find that the Janssons and Block Developers are, in this important way, just like the taxpayers in Repetto.[18]

Decisions will be entered under

Rule 155.

---

[18] The Commissioner also asserted section 6651(a)(1) and (2) additions to tax against each Jansson.  Section 6651(a)(1) imposes an addition to tax for failure to timely file a tax return.  Because the Janssons failed to file their Forms 5329, the Commissioner prepared substitutes under section 6020(b) determining the excise tax due for each year.  This presumptively makes the Janssons liable as well for the section 6651(a)(2) addition to tax for failure to pay tax shown on a return for each year at issue.  The Janssons provided no defense to either addition to tax at trial or on brief, and we therefore deem them to have conceded these issues. See Rule 151(e); Petzoldt, 92 T.C. at 683; Tufft, T.C. Memo. 2009-59.